UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| MARIO PASQUINI : | |
|     Plaintiff, : | |
| : | 3:03 CV 1414(PCD) |
| v. : | |
| : | |
| DESCO CORPORATION; DESCO CORPORATION : | |
| LONG TERM DISABILITY INCOME PLAN, and : | |
| UNUM LIFE INSURANCE COMPANY OF AMERICA : | |
|     Defendants : | FEBRUARY 9, 2004 |

**MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

**1.    INTRODUCTORY STATEMENT**

The defendants, Desco Corporation, Desco Corporation Long Term Disability Income Plan, and Unum Life Insurance Company of America ("Unum") move that the court enter judgment confirming Unum's administrative decision to deny the plaintiff's application for continued long-term disability benefits. As this is a case governed by the Employee Retirement Income Security Act of 1974, ("ERISA"), this court's review of Unum's decision is based solely on the administrative record Unum compiled below.

Unum is contemporaneously submitting a full and complete copy of the administrative record for the Court's review.[1]

## 2.     STANDARD OF REVIEW FOR ERISA DETERMINATION

A denial of benefits challenged under ERISA §1132(a)(1)(B) should be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989); Celardo v. Greater New York Auto. Dealers Health & Welfare Trust, 318 F.3d 142, 145 (2d Cir. 2003); Short v. Unum Life Insurance Company of America, 2003 U.S. Dist. LEXIS 22327 (D. Conn. 2003).

In this case, the policy contains the following language:

> The policy is delivered and is governed by the laws of the governing jurisdiction and to the extent applicable by the Employee Retirement Income Security Act of 1974 (ERISA) and any amendments. **When making a benefit determination under the policy, UNUM has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy**.

---

[1] The Second Circuit recognized in its recent decision in Muller v. First Unum Life Insurance Company, 341 F.3d 119, 124 (2d Cir. 2003) that a motion for judgment on an administrative record, like the instant motion, is akin to a bench trial "on the papers" and is an appropriate way for a district court to review and resolve an ERISA benefits claim.

Administrative Record (hereinafter "AR") at p. 573. (Emphasis added).

This language describing and defining Unum's authority to determine an applicant's eligibility for benefits and to interpret the terms and conditions of the policy are sufficient to invoke a court's deferential review of Unum's determination. Pulvers v. First Unum Life Insurance Company, 210 F.3d 89, 92 (2d Cir. 2000) (language granting administrator "discretionary authority to determine...eligibility for benefits and to interpret the terms and provisions of the policy" is of a kind that "generally prompts the arbitrary and capricious standard of review."); Short, 2003 U.S. Dist. LEXIS, *17; (quoting identical language); Rosenthal v. First Unum Life Insurance Co., 2002 U.S. Dist. LEXIS 8365, *15-*16 (S.D.N.Y May 9, 2002)(interpreting identical language);   Kocsis v. Standard Insurance Company, 142 F. Supp. 2d 241, 251-52 (D. Conn. 2001)(reservation of right to determine eligibility for insurance, entitlement to benefits, amount of benefits and sufficiency of amount of information triggers discretionary review).

In reviewing an ERISA claim in which the administrator's conduct is judged by the arbitrary and capricious standard, a court's examination of the facts of the case is limited to reviewing the administrative record compiled below. Miller v. The United

Welfare Fund, 72 F.3d 1066, 1071 (2d Cir. 1995). The scope of review is "very narrow." See Celardo, 318 F.3d at 146; Peterson v. Continental Casualty Co., 282 F.3d 112, 117 (2d Cir. 2002). In a deferential review case such as this, "a district court reviewing an ERISA denial of benefits is effectively functioning in an appellate capacity because it is precluded from considering new evidence." Larsen v. The Prudential Insurance Company of America, 151 F.Supp. 2d 167,172 (D. Conn. 2001).

     A court may overturn an ERISA administrator's decision to deny benefits "only if the decision to deny benefits was without reason, was unsupported by substantial evidence, or was erroneous as a matter of law." Pagan v. NYNEX Pension Plan, 52 F.3d 438, 442 (2d.Cir. 1995). "Substantial evidence" means such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decision maker; it requires more than a scintilla but is less than a preponderance of the evidence. Celardo, 318 F.3d at 146 (quoting Miller v. United Welfare Fund, 72 F.3d 1066, 1072 (2d Cir. 1995); Kocsis, 142 F.Supp. 2d at 252. "Where both the plan administrator and a spurned claimant offer rational, though conflicting, interpretations of plan provisions, the administrator's interpretation must be allowed to control." Pulvers, 210 F.3d 92-93. In a situation where a reviewing court finds it necessary to choose

between two competing yet reasonable interpretations of a pension plan, the court **must** accept that which is offered by the administrator.  Pagan, supra. at 443.  (Emphasis added).  Under the deferential standard of review, the court is "not free to substitute its own judgment for that of the plan's administrator as if it were considering the issue of eligibility anew." Kocsis, at 252.  Thus, the Court may not upset a reasonable interpretation of the administrator. Jordan v. Retirement Commission of Rensselear Polytechnic Inst., 46 F.3d 1264, 1271 (2d, Cir. 1995); Short, supra.

3.      ANALYSIS OF THE ADMINISTRATIVE RECORD

   a.    **The Long Term Disability Policy Contains Two Definitions of the Term "Disabled"**

The policy at issue contains two separate and distinct definitions of the term "disability," and the definition changes with time.  The first definition covers the period of time from Unum's approval of the claim and through and including the next 36 months.  In that "own occupation" period, disability is defined as follows:

You are disabled when UNUM determines that:

- you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury;
- you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury; and

5

> • during the elimination period, you are unable to perform any of the material and substantial duties of your regular occupation.

(AR 567).[2]

After Unum has paid disability benefits for 36 months, the definition of disability under the Policy becomes broader. In the "any occupation" period, the Policy provides:

> After 36 months of payments, you are disabled when UNUM determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.

(AR 567).[3] This case involves plaintiff's claim that Unum acted arbitrarily and capriciously by finding that he was not disabled under the second, "any occupation,"

---

[2] The Policy defines "**limited**" as "what you cannot or are unable to do." (AR 567). It defines "**material and substantial**" as duties that are "normally required for the performance of your regular occupation, and cannot be reasonably omitted or modified." "**Regular occupation**" means "the occupation you are routinely performing when your disability begins. UNUM will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location." "**Sickness**" is defined as "an illness or disease." An "**injury**" means "bodily injury that is the direct result of an accident and not related to any other cause." (AR 567).

[3] "**Gainful Occupation**" is defined as "an occupation that is or can be expected to provide you with an income at least equal to 60% of your indexed monthly earnings within 12 months of your return to work." "**Indexed Monthly Earnings**" is defined as "your monthly earnings adjusted on each anniversary of benefit payments by the lesser of 10% or the current annual percentage increase in the Consumer Price Index." (AR 566).

6

definition of disability. In order to put Unum's decision in context, it will examine and analyze the entire claim file below.

### b. Unum's Analysis of Plaintiff's Claim During the "Own Occupation" Period

Plaintiff submitted his claim for disability benefits on May 29, 1998. (AR 1-2). He had suffered a stroke in February of 1996, but was able to continue working.[4] In December 1997, plaintiff was admitted to Milford Hospital because of a fast and irregular heartbeat. (AR 23-27). His doctors noted that he had high blood pressure and was overweight, and therefore prescribed aterolol, a medication commonly known as a "beta-blocker," to alleviate his hypertension. One common side effect of a beta blocker is fatigue, and plaintiff told his doctor that he was feeling fatigued. (AR 29, 33).[5]

On April 27, 1998, plaintiff's attending physician, Walter Kernan, M.D., completed an Attending Physician's Statement and provided it to Unum. In it, Dr.

---

[4] Indeed, his employer told Unum that plaintiff had not missed much time from work before May 22, 1998, his last day of work. (AR 109).

[5] Although plaintiff had been experiencing fatigue since his February, 1996 stroke, (AR 022), the high blood pressure medication he was prescribed after his December, 1997 hospitalization caused him to have the "heavy fatigue" that led to his disability claim (AR 115). According to the plaintiff, the beta-blockers "knocked the sh-- out of me. That's when I got fatigued...If I do an hour's worth of physical work, I got to sleep." (AR 236-237).

Kernan wrote that plaintiff objectively presented with clinical findings of hypertension and obesity, and subjectively complained of day-time somnolence and muscle fatigueability.  (AR 59).  Dr. Kernan opined that plaintiff could not do any long-distance driving, believed that plaintiff presented with a "good" prognosis, and believed that he would release plaintiff from his care on or about December 1, 1998.  Id.  Plaintiff's own application for benefits mirrored the restrictions and limitations imposed by Dr. Kernan of "no long term driving/minimal traveling" because of day-time somnolence.  (AR 060).

Plaintiff's employer, Desco Corporation, provided Unum with information regarding the duties and responsibilities of plaintiff's position as a Product Manager.  On May 22, 1998, Gerald Dittmann wrote that the primary function of plaintiff's position was to "travel and visit our distributors," secondarily to "support our end users in [plaintiff's] district," and finally to "develop new products/accounts."  (AR 061).  According to Dittmann, the daily physical requirements of plaintiff's job required him to stand for 1 hour, walk for 1 hour, sit for 3, drive for 2 and lift or carry up to 10 pounds for 1 hour. Id.  Dittmann stated that plaintiff stopped working because of "high blood pressure and effect of medication taken to control it.  Claims he cannot travel or drive a car while on medication." Id.

8

On July 10, 1998, Deborah Atkinson, a Short Term Disability specialist at Unum, referred plaintiff's claim to its long term disability division. In that referral, Ms. Atkinson indicated that Unum had approved plaintiff's short term disability application. "Given medical provided reasonable to apporve [sic] claim thru 7/31 and request PCE,[6] sleep stu[dy]." (AR 062). Unum thereafter assigned Tricia Fournier, a Disability Benefit Specialist, to handle plaintiff's claim for long term benefits. (AR 063).

In its efforts to better understand the nature of plaintiff's condition,[7] Florence Aliberti, a registered nurse, wrote to Dr. Kernan on July 31, 1998 and asked him to answer eight very case-specific questions regarding plaintiff's medical condition and the restrictions and limitations Dr. Kernan had imposed.[8] (AR 097-094). On August 4,

---

[6] A "PCE" is a physical capacities evaluation.

[7] In a July 31, 1998 medical review by a registered nurse, Florence Aliberti, she wrote, "insured's primary reason for impairment appears to be fatigue. A[ttending] P[hysician] mentions depression, side effect of HTN [hypertension] meds and lifestyle issues as potential etiology. Insured however has been on HTN meds for some time. There is also a question of relationship between fatigue and stroke. However, his stroke occurred several months prior. We need some clarification and copies of his sleep study and psychiatric evaluation to better understand what his medical status is. We will write to AP and attempt to clarify." AR 83-84.

[8] For instance, Nurse Aliberti asked Dr. Kernan to "provide your opinion if his psychiatric or psychosocial factors are the primary reason for his fatigue" and to "help us understand how his fatigue only restricts the distance of travel and not other activities at work or

9

1998, Dr. Kernan provided Unum with a letter describing plaintiff's condition and also completed a Physical Capacities Evaluation form for Unum. In his letter, Dr. Kernan wrote:

> Since his stroke, his main difficulties have been dysartha, right leg weakness, impaired dexterity in the right hand, and disabling fatigability. The basis of Mr. Pasquini's claim for disability is primarily the fatigue. His fatigability has several components. At the end of an active day, he is somnolent and physically exhausted. He has fallen asleep while driving home on several occasions. Although he awakens in the morning feeling reasonably refreshed and sleeps reasonably soundly, I recently performed a sleep test which revealed no definite evidences for sleep apnea. His fatigability also includes right sided heaviness and right foot dysfunction after effortful activity including walking typically required by his occupation. In the past, Mr. Pasquini and I have noticed that his fatigability seems to be worse on high doses of Norvasc or with beta-blocker therapy. During periods off of beta-blocker therapy, however, [it] has persisted. At my urging, Mr. Pasquini did return to full-time employment. Because of fatigability, however, he found it extremely difficult to keep up with the demands of his work schedule. As I mentioned above, car rides in the late afternoon have proven to be unsafe. He has been able to keep up with the expectations for his work performance. I believe Mr. Pasquini made a valiant effort to remain at work. After discussion with myself and Dr. Stephen Huot, Mr. Pasquini left work earlier this year.

(AR 121-22).

In the Physical Capacities Evaluation, Dr. Kernan indicated that in an eight hour workday plaintiff could sit continuously, could stand for eight hours so long as he

---

home." (AR 097-094)

alternated, and could walk for two hours.  Dr. Kernan wrote that plaintiff's medical condition prevents him from traveling.  "Travel produces extreme fatigue that impairs function."  (AR 119-20).

Nurse Aliberti conducted a medical review of the medical information then in plaintiff's file and concluded that:

> Fatigue is identified as the primary limiting factor impacting his functional capacity.  We have medical consensus that the insured's stroke and his medication's side effects are a component of his fatigue.  Insured did attempt to return to work, however it was limited by his fatigue.  Thus R&Ls are reasonable and we would not expect significant improvement.  Above was discussed with outside physician, Dr. Charles Perakis, who is in agreement.

(AR 123).  After conducting a vocational review of plaintiff's position and determining that "driving is a material duty of the occupation, though duration is a variable.  Walking is also a material duty," (AR 130), Unum notified plaintiff by its August 24, 1998 letter that it had approved his application for long term disability benefits.  Unum began paying plaintiff $3,106.44 per month.  (AR 145-44).

    **c.**    **The Information That Unum Received During the Plaintiff's "Own Occupation" Period of Disability**

During his "own occupation" period, plaintiff and his doctors continued to provide Unum with medical evidence to demonstrate that he was disabled.[9]

On September 28, 1998, Dr. Kernan finally answered Ms. Aliberti's July 31 letter. In part, he responded that:

> The main problems are decreased endurance, fatigability, dysartha and right hemiparasis. These problems are primarily caused by the stroke which Mr. Pasquini experienced in 1996. It is plausible that physical deconditioning and medications necessary to treat his hypertension (Labetalol) may be contributing to some of his symptoms.....Mr. Pasquini is not depressed and he is not malingering. It is my opinion that there is no psychiatric or psychosocial factor that is primarily responsible for his fatigue. Mr. Pasquini's fatigue relates to the stroke he suffered in 1996 and the treatment now required to control his hypertension. We learned over time that the sequelae of his stroke impaired his ability to perform safely in his chosen occupation. It took several months for us all to learn this. ....It was not safe for him to continue in that occupation and he was not able to be effective in that occupation.
>
> Mr. Pasquini reports that he had been falling asleep while driving long distances particularly in the late afternoon. I have, therefore requested that he not drive long distances. The same fatigability that causes him to fall asleep in the late afternoons probably does impair his ability to perform other tasks at work, but not to the extent that he should refrain from attempting those tasks.
>
> I believe that Mr. Pasquini's prognosis to return to part-time work is excellent. In fact, I completed a form for Continental Insurance Company on 9/10/98 with Mr. Pasquini. That time, we agreed that he should be able to assume part-time

---

[9] The Policy requires a beneficiary receiving disability benefits to continue to provide Unum with proof that the disabling condition continued.  (AR 554).

> employment on 10/1/98. I believe that Mr. Pasquini is totally disabled to perform his prior occupation. He maintains, however, excellent cognitive skills and residual physical skills that would allow him to perform more sedentary work on a part- time basis. I would not rule out the possibility that Mr. Pasquini might be able to resume full-time work in the distant future.

(AR 154-52). [10]  Dr. Kernan also completed another Physical Capacities Evaluation in which he evaluated plaintiff as being able in an eight hour workday to sit for six hours, stand for three, and walk for two hours, all with rest.  According to Dr. Kernan, "either Labetalol or Cordura is producing [his] fatigue."  (AR 151-50).

Jennifer Wheeler[11] also spoke with the plaintiff to assess his ongoing condition. In an October 26, 1998 telephone call with her, plaintiff told her that he walked two miles daily and became "pooped," and naps at 3:00 PM for two hours.  He stated that he could not drive for greater than one hour, and "begins to limp more severely as the day progresses and he becomes more tired."  (AR 157-56; 192).

---

[10] Dr. Kernan also provided Ms. Aliberti with a copy of a sleep study performed on July 2, 1998 that indicated that plaintiff "does not have obstructive sleep apnea" and opined that "his daytime sleepiness seems most clearly explained by his sensitivity to sedating medications, especially the use of beta-blockers."  (AR 148).

[11] Jennifer Wheeler, a Unum Disability Benefits Specialist, took over responsibility for processing the plaintiff's claim in August 1998.  (AR146).

13

In an April 21, 1999 discussion with Richard Theriault, another Unum Disability Benefits Specialist, plaintiff again emphasized his fatigue. Plaintiff said that his fatigue recently had become worse even though his blood pressure was under control. "If I lay down I sleep.... If I walk 1.5 miles I'm ready for rest. Try to walk every day. Ride stationary bike everyday half an hour, ready to sleep when done. No hobbies really." (AR 197-98). Theriault also wrote that plaintiff told him that "he used to work on house, but have hard time when do really physical things, get exhausted. If I drive for more than 45 minutes, I get exhausted and drowsy." Id.

As part of the claims process, plaintiff provided Unum with a form in which he detailed his education, training and experience since 1984 in the electronics and engineering fields. (AR 205-208). In that form, he stated that he left his job with Desco because of "extreme fatigue and sleepiness after limited driving...require 1-2 hr nap each day." (AR 207).

Dr. Kernan also provided Unum with another narrative which reflected his diagnosis and opinions of plaintiff's condition. In this June 14, 1999, letter Kernan wrote:

> Mr. Pasquini's blood pressure is under adequate control most of the time. He continues to have marked fatigue with effortful activity. He is unable to drive

>more than short distances because he falls asleep easily. He is most likely to fall asleep while driving in the afternoons.
>
>Mr. Pasquini is restricted from working an 8 hour day which would require him to travel by car for the entire day. He is limited by his ability to maintain effortful activity throughout the day. In particular, he is limited by his ability to drive for more than short distances.
>
>He is unable to work full-time because he is fatigued. Over the course of an entire day, he is unable to maintain his concentration, wakefulness and work pace. If he does not sleep for 1 to 1.5 hours during the day, he develops inattention and discomfort related to fatigue. Mr. Pasquini is able to work part-time. His work schedule would need to account for his impaired endurance and his need for afternoon sleep.

(AR 218-17).