With another vocational review that indicated plaintiff's occupation was not available part-time and did not allow for naps in the afternoon, (AR 224), Unum's personnel agreed "that claimant's symptoms will not change and that meds he is on which fatigue him [make his] need for afternoon nap ...reasonable." Furthermore, they acknowledged that the plaintiff's condition and symptoms likely would continue without improvement through the duration of the "own occupation" period. (AR 240).

The materials and information plaintiff provided to Unum and which Unum obtained from plaintiff's doctors confirmed that belief. During the next 18 months, Unum continued to receive information from the plaintiff and his doctors indicating that plaintiff's physical fatigue had not abated, and Unum continued to find plaintiff disabled from his "own occupation." (AR 328-29; 377). The administrative record contains the following entries:

- In a November 3, 1999 telephone call with Theriault, plaintiff told him that he was looking for a job that would allow him to work from home but the "biggest barrier with trying to work is fatigue;" (AR 265-67)

- In a January 31, 2000 telephone call with Theriault, plaintiff said that "fatigue is the biggest barrier. Driving is the worst...too sleepy. Once fell asleep in driving." (AR 280);

- On April 23, 1999, Dr. Kernan drafted an office note in which he wrote that plaintiff "sleeps 2 - 2 ½ hours" a day. (AR 288);
- On April 23, 1999, Stephen Huot, M.D. wrote to Dr. Kernan that plaintiff "does exercise with a stationary bike for ½ hour and walks 2 hours per day. However, he continues to complain about fatigue which has worsened since his recent increase in medication. He takes naps in the afternoon." (AR 289);

- On February 17, 2000, Dr. Kernan wrote to Nurse Aliberti that plaintiff

"had persistent fatigability since his stroke in 1996...the cause of his fatigue most likely relates to both the stroke and the medications to treat his hypertension. Given the duration and persistence of Mr. Pasquini's fatigue, I cannot predict when it will resolve. When I last saw him in the office on 2/9/00, he was continuing to have fatigue, particularly after exercise. He is taking a long nap in the afternoon.  He continues to be unable to tolerate long distance driving, particularly driving in the afternoon. At this point, Mr. Pasquini is not ready to return to full-time employment." (AR 323);

- On June 30, 2000, Dr. Kernan again provided an updated estimate of plaintiff's physical capacities.  He stated that plaintiff's primary diagnosis was stroke, with secondary conditions of hypertension and being overweight. Dr. Kernan restricted him to no heavy lifting and no continuous activity of greater than 3 hours, writing that he:

    Cannot work 〉 4h/day...Prognosis for recovery is guarded....He has achieved maximum medical improvement.... He has 3 hours of sedentary activity, 1 hour of light activity and no medium or heavy activity. I do not anticipate a significant change, although I cannot exclude such an occurrence....His fatigue is directly associated with his physical activity. He currently requires a 1-2 hour nap daily.... The possible interaction between his medications and stroke cause this patient to fatigue easily. There is no indication that this relationship will improve significantly. Efforts to change his medications have failed.  (AR 347-45).


- On June 17, 2000, plaintiff wrote that:
    "My fatigue level is somewhat greater than before my dose change. I nap 2 hours a day while still sleeping 8+ hours at night. Drowsy when I drive for an extended period of time....Typical day: Wake at 5:30, make breakfast for wife. Return to bed until 8:30. Have breakfast, shower, get dressed. Watch TV until 10.00.  Go for a 2+ mile walk with my dog. Return home and have lunch. Do house shores or TV until 2:00. Take nap. Awake at 5:00 and start dinner. After dinner, go for a walk or watch TV. Go to bed at 9:30....I have no plans to return to the workforce in a part or full-time basis. Physical exertion causes me to get fatigued and sleepy. I take a nap almost everyday."  (AR 249-51).

- On February 18, 2001, Dr. Kernan provided Unum with another estimate of plaintiff's functional capacities, saying that he had 3 hours of sedentary

activity and 1 hours of light activity per day. "I do not anticipate a significant change, although I cannot exclude such an occurrence." (AR 395-97).

### d. Unum's Analysis of the Medical and Surveillance Information That Came to it During its Analysis of Plaintiff's Claim During the "Any Occupation" Period

On March 19, 2001, Deborah Cole,[1] a Unum Disability Benefits Specialist wrote to plaintiff to inform him that Unum was beginning its analysis of his claim under the post-36 month "any occupation" definition under the Policy. (AR 399-400). On May 22, 2001, she requested that plaintiff be placed under surveillance. In particular, she asked that attention be paid "to afternoon hours as claimant claims day time somnolence. (AR 402).

International Claims Specialists conducted 56 hours and 46 minutes of surveillance during the five days between Saturday, June 23, 2001 and Wednesday, June 27, 2001, prepared a 16 page report of the results of the surveillance, and also provided Unum with still photos and videotapes of the surveillance. (AR 406-422).[2] The results of the surveillance indicated that plaintiff was much more physically active–particularly in the late afternoons–than he had informed Unum or Dr. Kernan. For example, the surveillance demonstrated plaintiff doing yard work at his home during the afternoon of June 23, 2001. (AR 419). The next day, June 24, at noon he drove

---

[1] The plaintiff's file was reassigned to Deborah Cole from Erin Walker on July 24, 2000 (AR 652).

[2] The photographs and a CD of the videotape are part of the Administrative Record and available for the court's viewing.

himself and his wife from Milford to Newtown, and then he drove himself and his wife home, leaving Newtown in the early evening and arriving home after 7:00 PM. (AR 417-418). On Monday, June 25, 2001, he left home between 2:17 PM and 2:30 PM, drove to Spencer's Marina, a marina in Milford approximately three miles from his home, and sailed his boat out onto Long Island Sound. (AR 414). Plaintiff returned in his sailboat to the marina and left for home at 5:47 PM. (AR 414-13).

The surveillance of the next day, June 26, showed plaintiff had an even more active afternoon than he had had on the preceding days. Plaintiff left his home between 10:13 AM and 10:20 AM and returned before 11:47 AM. (AR 413). He left home again between 2:03 PM and 2:21 PM and drove to Spencer's Marina. (AR 412). At 2:38 PM, the surveillance team saw plaintiff motoring his sailboat out of Milford Harbor south into Long Island Sound. Ten minutes later, plaintiff began to unfurl and hoist the mainsail and jib, cut the motor, and again sail out into Long Island Sound. The surveillance ended that day at 4:10 PM. Plaintiff was last seen sailing further out into Long Island Sound. (AR 143-411). Notably, he was alone on his boat both on June 25 and 26.

On the final day of surveillance, plaintiff drove with his dog from his home in Milford to a park in Fairfield. He left home at 10:25 AM and arrived in Fairfield at 10:53 AM, exited his car and took his dog for a walk. He returned to his car at 12:07, arrived at home at 12:35 PM and was not observed further during that final day of surveillance. (AR 411-10).

After receiving the surveillance report and videotape, Ms. Cole met internally with another Unum employee, Julie Longacre, to discuss the plaintiff's claim. They both determined that the surveillance demonstrated that the plaintiff "appears to have greater functional capacity" than he claimed either to Unum or to his doctor, Dr. Kernan. (AR 424). Therefore, they decided to inform Dr. Kernan of the plaintiff's observed capacities and seek his assistance in understanding the plaintiff's actual restrictions and limitations, if any. Ms. Cole then wrote to Dr. Kernan, described the results of the recent surveillance, and specifically requested in light of the plaintiff's observed activities that he provide **objective medical information** to support the restrictions and limitations that he previously had placed on Mr. Pasquini's ability to work. In her July 26, 2001 request, Ms. Cole wrote:

> It appears...that [claimant's] blood pressure continues to be controlled by medication. A sleep study was performed and there is no evidence of obstructive sleep apnea. You have indicated that in the past **the claimant has reported to you severe fatigue that requires frequent naps** and that he would only have capacity for 3 hours of sedentary activities as well as 1 hour of light capacity per day.
>
> Recently we have observed Mr. Pasquini sailing his boat alone for several hours. He has been observed to be unfurling and hoisting the sail and jib as well as the other activities entailed in running a sailboat. We have also observed him doing yardwork, actively walking with his dog for a few hours at a time and then going out and doing errands for the rest of the day. It would appear that Mr. Pasquini has a much greater functional capacity than you may have been aware of. Based on our observations of his activities, we believe that he would have 8 hours of sedentary to light capacity per day.
>
> If you do not agree with this, please provide us with **specific additional objective information** to support your opinion. This would include a specific diagnosis of a sickness or injury that would prevent him from doing a sedentary

to light occupation.

(AR 432)(Emphasis added).

Ms. Cole spoke several days later with the plaintiff regarding the change in policy definition. In that conversation, plaintiff reiterated his claimed restrictions and limitations. He told her he went for a 1½ hour walk each day, did odd jobs around the house, and paints the bottom of the boat which takes him 3 days. However, he also said that "he takes a nap every day. He goes out on his boat, but **usually naps on the boat**. He drives within ½ -1 hour." (AR 433). Ms. Cole told him:

> We have observed him on his boat, driving and working around the house. I told him that based on the info from Dr. Kernan, he doesn't give any specific R[estrictions] &L[imitations] or reasons why he could not work in a sedentary position....**I asked him to provide additional medical info with objective findings stating his R&Ls**. Told him we are reviewing his transferrable skills to do a gainful sedentary occupation [review].

(AR 433)(Emphasis added).

Dr. Kernan responded to Ms. Cole's request for objective medical information on July 31, 2001. Dr. Kernan wrote:

> As a consequence of his stroke and probably also of his current drug therapy, Mr. Pasquini continues to experience fatigability. This fatigability is, in my opinion, limiting his ability to participate in his usual occupation. In particular, after effortful activity (e.g., mowing the lawn, walking, and other effortful activity), he becomes extremely tired and sleepy. He is refreshed with sleep. **According to Mr. Pasquini**, driving after effortful activity or later in the day is associated with excessive sleepiness.

(AR 435)(Emphasis added).

After accumulating all the information identified above, Ms. Cole presented the

plaintiff's file for medical review, first to an in-house registered nurse and then to a physician. Susan Iannarelli, R.N., and Daniel Krell, M.D., each reviewed the available records, particularly Dr. Kernan's July 31 response, and on August 3, 2001 agreed that "[d]ocumented activity and lack of objective evidence of significant physical impairment support claimant's ability to perform activities consistent with at least sedentary activity on a full time basis." (AR 437).

On August 2, 2001, Ms. Cole referred the plaintiff's application to GENEX of Wayne, Pennsylvania, for it to do an analysis of plaintiff's training, education and experience to determine whether his proven work and educational experience could be matched with any then-currently available job opportunities in the local job market. Ms. Cole provided GENEX with relevant materials already contained in the administrative record: the medical reviews of Nurse Iannarelli and Dr. Krell; the Education and Employment Form plaintiff provided to Unum, a Job Analysis form Dittman from plaintiff's employer had sent to Unum; and the description of plaintiff's job and job functions from the Dictionary of Occupational Titles. (AR 464-67; 446-57).

In the meantime, Dr. Kernan, at plaintiff's request, wrote to Ms. Cole attempting to support further his July 31, 2001 opinion of plaintiff's limited work capacity. (AR 441-42). Dr. Kernan wrote:

> As a result of his stroke (or possibly the medications he takes for hypertension), Mr. Pasquini experiences excessive daytime somnolence. Typically he must take a 1-2 hour nap in the early afternoon in order to maintain adequate wakefulness for the rest of the day. When Mr. Pasquini is very sedentary, he is occasionally able to forego an afternoon nap. With physical or mental effort, however, he

> becomes extremely tired. During these periods of fatigue, he is unable to keep his eyes open, unable to drive safely, and unable to concentrate and complete routine tasks. Because of Mr. Pasquini's daytime sleepiness and fatigability, I believe that he is only capable of working for 4-6 hours. I continue to believe that the cause of his daytime sleepiness and fatigability is related to his stroke, recognizing that medications may be playing a role. There is a remote possibility tht Mr. Pasquini may also be experiencing narcolepsy. I plan to order a sleep study with multiple sleep latency testing in the very near future. If he should be found to have narcolepsy, he may respond to trial of stimulant therapy.

(AR 441-42).

After receiving Dr. Kernan's letter, Ms. Cole asked Nurse Iannarelli and Dr. Krell to review it, specifically asking "does Dr. Kernan's letter dated 8/6/01 change the opinion of previous review?" (AR 444). The conclusion of both medical professionals was negative. Dr. Krell responded:

> **Dr. Kernan's letter does not include objective evidence explaining Clmt.'s inability to sustain sedentary activity on a full time basis**. Clmt.'s observed level of activity is inconsistent with the R&L's provided. Activity documented by surveillance appears to be in excess of that reported to Unum by the claimant or his AP, Dr. Kernan.

(AR 444)(Emphasis added).

GENEX completed its analysis and provided Unum with an August 21, 2001 report. Gary A. Young, MEd., CRC, CDMS, CCM, NCC, prepared a detailed transferable skills analysis and forwarded it to Ms. Cole.[3] Mr. Young summarized plaintiff's work and medical history, noting that neither he nor his doctor provided "any objective evidence for his conclusions" that he had limited work capacity. (AR 477) Mr.

---

[3] Another GENEX employee, Kevin Ufler, M.Ed. CRC, reviewed Young's report and concurred in its conclusions. (AR 474).

Young then went on to provide Unum with his opinion that Mr. Pasquini's education, work history and experience gave him proven abilities in the fields of sales technology and engineering, noting that he had demonstrated that he could:

- Apply knowledge and familiarity of technical equipment, product or services offered for sale.
- Demonstrate features of products or services to gain trust and confidence of potential buyers.
- Plan and prepare complex sales contracts and purchase orders.
- Identify errors in figures or wording sales documents.
- Use and manage own time and work.
- Know and apply basic principles of engineering.
- Use math and science to solve engineering problems.
- Use chemical formulas.
- Form a mental image of objects or structures by looking at drawings.
- Make drawings to illustrate machine designs, factory layouts, or highway plans.
- Persuade, advise, and assist customers in purchasing engineering products or services.
- Explain technical ideas to others.
- Evaluate product qualities.

(AR 476-75). GENEX further found that there were positions available in the Greater New Haven/Meriden areas in which plaintiff could utilize his proven skills that would pay him between $25.18 and $31.77 per hour. Id.

Since there were sedentary "gainful occupations" available to plaintiff in the Greater New Haven area that would have provided him with "an income at least equal to 60% of your indexed monthly earnings within 12 months" of his return to work, Unum notified plaintiff by letter dated September 7, 2001 that he no longer met the policy definitions of "disabled" and that it was discontinuing benefits to him. Ms. Cole informed him that:

> Our medical staff reviewed the medical information supplied by Dr. Kernan. Dr. Kernan states that because of your daytime sleepiness and fatigability that you are only capable of working 4-6 hours per day. Documented surveillance activity and lack of objective evidence of significant physical impairment support your ability to perform activities consistent with at least sedentary activity on a full time basis.
>
> We also referred your file to a vocational consultant for evaluation. The consultant reviewed your restrictions and limitations, as well as your employment and educational history, and concluded that you would be able to engage in the following gainful occupations:
>
> - Engineering Manager - Electronics
> - Industrial Engineer
> - Consultant
> - Specifications Writer
>
> Gainful occupation means an occupation that is or can be expected to provide you with an income at least equal to 60% percent of your indexed monthly earnings within 12 months of your return to work.
>
> Because you no longer meet the contractual definition of disability, we are denying any further liability on your claim. A check for benefits payable to August 20, 2001 was sent under separate cover on August 21, 2001.

(AR 481-483).

On September 14, 2001 plaintiff's attorney requested that Unum review its decision (AR 487-488), and Ms. Cole on September 27, 2001 forwarded plaintiff's claim to Unum's Quality Performance Support Unit for completion of an administrative review. (AR 489). Kiernan Shields, a Senior Appeals Specialist, was assigned to handle the plaintiff's claim during the administrative appeal. (AR 491).

During the appeal process, plaintiff provided Unum with more medical information that he and his attorney suggested explained the source of plaintiff's

daytime somnolence.  On October 9, 2001 and again on November 15, 2001, plaintiff underwent sleep studies at the Yale Center for Sleep Medicine, and his attorney forwarded the results to Unum.  Unlike the earlier sleep study, these studies were positive for sleep apnea.  After the latter of the two, Janet Howard-Flanders, MD, wrote Dr. Kernan that:

> This 61 year old man returns for polysomnigraphy with CPAP[4] titration after previous polysomnigraphy on 10/9/01 was positive for obstructive sleep apnea....
>
> Impression: An improvement in obstructive sleep apnea was noted with the use of nasal CPAP at 11 cm H2O on this study night. The patient did have periodic leg movements in sleep, but these were not associated with sleep fragmentation.
>
> Recommendations: Nasal CPAP at 11cm H2O is recommended in this patient, while other correcting factors are being identified and treated.  Clinical correlation is recommended to determine any clinical significance to the increased periodic leg movements in sleep.

(AR 508-100).  After receiving this report, Dr. Kernan wrote to plaintiff explaining to him that his now-diagnosed sleep apnea actually may have caused "the hypertension and daytime sleepiness that has effected [sic] you for many years."  (AR 507).[5]  Plaintiff's lawyer sent all of these records along to Unum in support of plaintiff's appeal.

On December 17, 2001, Mr. Shields requested that Dr. Krell again review the plaintiff's entire file, including the two recent sleep studies and Dr. Kernan's letter to

---

[4]  "Continuous Positive Airway Pressure" is a device a patient wears during sleep to alleviate the effects of sleep apnea.

[5]  Dr. Kernan was so hopeful that using a CPAP would eliminate plaintiff's daytime somnolence that he prescribed one for plaintiff to use.  (AR 507).

plaintiff, to assess whether all the available medical information supported Dr. Kernan's opinion that plaintiff had only four to six hours of work capacity per day. Dr. Krell's response came on December 20. In it, Dr. Krell summarized all the medical and surveillance information that was in the Administrative Record and concluded that:

> Claimant has consistently reported daytime sleepiness since his CVA. Fatigue and sleepiness are sometimes recognized after CVAs. Sleep apnea, a more common cause of daytime sleepiness, was documented with improvement noted with the use of CPAPs; the use of this modality is expected to reduce the daytime sleepiness.
>
> The claimant's self-reported activity and pattern of napping and the observed activity per surveillance are not consistent with an impairing level of daytime sleepiness that would preclude the performance of activities required of a sedentary occupation on a full time basis.

(AR 527).

Based upon reviewing all the medical and non-medical information then available, Unum determined that its initial determination terminating plaintiff's benefits was appropriate, and Mr. Shields wrote to inform plaintiff's attorney of that fact. Shields wrote:

> Our physician noted that daytime sleepiness is reported to date from the time of Mr. Pasquini's CVA. While fatigue and sleepiness are sometimes recognized symptoms after CVAs, our physician stated that it was not clear that his sleepiness is caused primarily by the stroke. Sleep apnea, which is a more common cause of daytime sleepiness was documented with 2 recent sleep studies. However, improvement in the sleep apnea was shown with use of a CPAP. Our physician noted that use of CPAP would be expected to significantly reduce the complaints of daytime sleepiness.
>
> It was the conclusion of our physician and Mr. Pasquini's self-reported activity and pattern of napping and the observed activity during surveillance are not consistent with an impairing level of daytime sleepiness that would preclude the

performance of activities required of a full time sedentary occupation.

Based on a review of the above information, it is our determination that your client's condition would not preclude him from performing the duties of several