37. On 8/2/01, Cole spoke with plaintiff. He told her "his status is still the same....Goes for 1.5 hour walk each day, does odd jobs around the house. He paints the bottom of the boat which takes him 3 days. He doesn't play baseball. He takes a nap everyday. He goes bout on his boat, but usually naps on the boat. He drives within .5 - 1 hour. He said Dr. Kernan said he could work 4-6 hours. I explained the change in definition. I told him that we have observed him on his boat, driving and working around the house. I told him that based on the info from Dr. Kernan, he doesn't give any specific restrictions and limitations or reasons why he could not work in a sedentary position.... I asked him to provide additional medical info with objective findings stating his R&Ls. Told him we are reviewing his transferable skills to do a gainful sedentary occupation. He asked 'what is gainful?'. I told him 60% of his salary."   433

38. On 7/31/01 Dr. Kernan wrote to Unum that:   435

"As a consequence of his stroke and probably also of his current drug therapy, Mr. Pasquini continues to experience fatigability. This fatigability is, in my opinion, limiting his ability to participate in his usual occupation. In particular, after effortful activity (e.g., mowing the lawn, walking, and other effortful activity), he becomes extremely tired and sleepy. He is refreshed with sleep. According to Mr. Pasquini, driving after effortful activity or later in the day is associated with excessive sleepiness."

39. On 8/2/01, two Unum medical consultants met with a Unum Vocational Rehabilitation Specialist, Julie Longacre, to review plaintiff's claim. Both Daniel Krell, M.D. and Susan Iannarelli, R.N. agreed that "[D]ocumented activity and lack of objective evidence of significant physical impairment support claimants ability to perform activities consistent with at least sedentary activity on a full-time basis."   437

16

40. On 8/6/01, Dr. Kernan wrote to Unum:                                            441-442

   "At Mr. Pasquini's request, I am writing with an addendum to my last letter of 7/31. As a result of his stroke (or possibly the medications he takes for hypertension), Mr. Pasquini experiences excessive daytime somnolence. Typically he must take a 1-2 hour nap in the early afternoon in order to maintain adequate wakefulness for the rest of the day. When Mr. Pasquini is very sedentary, he is occasionally able to forego an afternoon nap. With physical or mental effort, however, he becomes extremely tired. During these periods of fatigue, he is unable to keep his eyes open, unable to drive safely, and unable to concentrate and complete routine tasks. Because of Mr. Pasquini's daytime sleepiness and fatigability, I believe that he is only capable of working for 4-6 hours. I continue to believe that the cause of his daytime sleepiness and fatigability is related to his stroke, recognizing that medications may be playing a role. There is a remote possibility that Mr. Pasquini may also be experiencing narcolepsy. I plan to order a sleep study with multiple sleep latency testing in the very near future. If he should be found to have narcolepsy, he may respond to trial of stimulant therapy."

41. On 8/9/01, Nurse Iannarelli and Dr. Krell reviewed Dr. Kernan's                  444
   8/6/01 letter. Each noted that his "letter does not include objective clinical evidence explaining claimant's inability to sustain sedentary activity on a full-time basis. Claimant's level of activity is inconsistent with the R&Ls provided.

   Dr. Krell wrote, "Activity documented by surveillance appears to be in excess of that reported to Unum by the claimant or his AP, Dr. Kernan."

17

| | | |
|---|---|---|
| 42. | On 8/16/01 Longacre referred plaintiff's claim to Genex, an outside agency, for a T[ransferred] S[kills] A[analysis]. She provided Genex with the medical reviews by Dr. Krell and Nurse Iannarelli, the Dictionary of Occupational Title descriptions of Sales Representative, Electronic Parts and Manufacturer's Representative, plaintiff's employer's analysis of plaintiff's position, and plaintiff's own employment and educational history. | 446-67 |
| 43 | On 8/21/01, Genex, by Gary A. Young, MEd., CRC, CDMS, CCM, NCC, provided a transferred skills analysis to Unum. In part, he wrote: | 474-478 |

"This file was referred by Julie Longacre with UnumProvident Insurance Company to Genex for completion of a transferable skills analysis. Mr. Pasquini is a 61 year old Milford, CT resident who was disabled on 8/23/98 while employed as a Product Manager with DESCO-ATC. The initial disability is daytime somnolence. The request was to find suitable sedentary work within the education and work background of Mr. Pasquini.

"Medical Status: Mr. Pasquini has been disabled with daytime somnolence reporting that he had extreme fatigue and sleepiness even after limited driving. He reported that he had to take a nap every day for 2-3 hours. A review of the medical information and other available data indicates that the medical restrictions. [sic] The attending physician, Dr. Kernan, indicates that Mr. Pasquini is capable of working 4-6 hours a day. However, he does not include any objective evidence for his conclusions.

\*     \*     \*

18

Transferable Skills: The TSA demonstrated proven abilities in the following work fields:

Sales technology
> Apply knowledge and familiarity of technical equipment, product or services offered for sale.
>
> Demonstrate features of products or services to gain trust and confidence of potential buyers.
>
> Plan and prepare complex sales contracts and purchase
>
> orders.
>
> Identify errors in figures or wording sales documents.
>
> Use and manage own time and work.

Engineering

> Know and apply basic principles of engineering.
> Use math and science to solve engineering problems.
> Use chemical formulas.
> Form a mental image of objects or structures by looking at drawings.
> Make drawings to illustrate machine designs, factory layouts, or highway plans.
> Persuade, advise, and assist customers in purchasing engineering products or services.
> Explain technical ideas to others.
> Evaluate product qualities.

19

Employment Options: Based on my research, these jobs exist in the local New Haven/Meriden, CT primary metropolitan statistical area economy based on the 1999 OES information...The restrictions and limitations were combined with the past work and education to identify alternative occupations. Below is a list of positions that are consistent with this profile in my professional judgment.

Engineering Manager, electronics....$31.77/hour
Industrial Engineer.....$25.18/hour
Consultant.....$31.77/hour
Specifications Writer...$31.77/hour

20

44. On September 7, 2001, Unum wrote to inform plaintiff that it would    481-483
not extend his benefits into the "own occupation" period. Deborah
Cole wrote:

"We have completed a review of your claim for long term disability
benefits and are unable to continue benefits.

"Your policy defines the parameters for which benefits are payable.
You are disabled when Unum determines that:
• you are limited from performing the material and substantial
duties of your regular occupation due to your sickness or injury;

• you have a 20% or more loss in your indexed monthly
earnings due to the same sickness or injury; and

• during the elimination period, you are unable to perform any
of the material and substantial duties of your regular occupation.

"After 36 months of payment, you are disabled when Unum
determines that due to the same sickness or injury, you are unable
to perform the duties of any gainful occupation for which you are
reasonably fitted by education, training or experience.

"Material and substantial duties mean duties that:
• cannot be reasonably omitted or modified."

"Regular occupation means the occupation you are routinely
performing when your disability begins. Unum will look at your
occupation as it is normally performed in the national economy,
instead of how the work tasks are performed for a specific employer
or at a specific location.

"Based on the policy definition of disability, you are no longer
eligible for benefits.

21

"Our medical staff reviewed the medical information supplied by Dr. Kernan. Dr. Kernan states that because of your daytime sleepiness and fatigability that you are only capable of working 4-6 hours per day.

" Documented surveillance activity and lack of objective evidence of significant physical impairment support your ability to perform activities consistent with at least sedentary activity on a full time basis.

"We also referred your file to a vocational consultant for evaluation. The consultant reviewed your restrictions and limitations, as well as your employment and educational history, and concluded that you would be able to engage in the following gainful occupations:

1.  Engineering Manager - Electronics
2.  Industrial Engineer
3.  Consultant
4.  Specifications Writer

"Gainful occupation means an occupation that is or can be expected to provide you with an income at least equal to 60% percent of your indexed monthly earnings within 12 months of your return to work.

"Because you no longer meet the contractual definition of disability, we are denying any further liability on your claim. A check for benefits payable to August 20, 2001 was sent under separate cover on August 21, 2001.

"If you have additional information to support your request for disability benefits, please send it to my attention for further review.

481-483

22

| | | |
|---|---|---|
| 45. | Before Cole sent the letter, she referred Unum's decision to another Unum employee, Linda Rasero, for her review. Rasero approved Unum's decision on 9/6/01. | 484 |
| 46. | On 9/14/01 plaintiff's attorney, Donna Civitello, wrote to Deborah Cole asking for copies of the claim file, all documents Unum reviewed, relied and did not rely upon in making its claim, and to "Please withhold any decision regarding the merits of this appeal until this additional evidence has been submitted and considered." | 487-488 |
| 47. | On 9/27/01 Cole acknowledged plaintiff's request for an appellate review. "This request on your claim file have been sent to quality performance support unit for completion of the appellate review. They will contact you shortly with the name of the appeal specialist who review your claim." | 489 |
| 48. | Unum assigned Kiernan Shields, Senior Appeals Specialist, to plaintiff's appeal. | 491 |
| 49. | On 12/4/01 Atty. Civitello sent Unum a report of a sleep study plaintiff underwent on 10/9/01 that was performed by Janet Howard-Flanders, MD of Yale University Center for Sleep Medicine, a letter dated 10/11/01 from Dr. Howard-Flanders to Dr. Kernan, a sleep study of 11/15/01 performed by Dr. Howard-Flanders, and a letter from Dr. Kernan to plaintiff dated 12/5/01. | 507-515 |

23

50. In his 12/5/01 letter to plaintiff, Dr. Kernan wrote:                                    507

   "Your sleep study from 11/15/01 confirmed the diagnosis of sleep apnea. The pulmonologist who supervised the study has recommended that you begin treatment with nasal continuous positive airway pressure (CPAP) at night. It is possible that sleep apnea is the cause of your daytime sleepiness....Investigators now believe that sleep apnea may be associated with increased risk for stroke. Several studies are underway to confirm this likely hypothesis. There is no question; however, that sleep apnea will contribute to hypertension and daytime sleepiness that has effected [sic] you for many years."

51. Plaintiff's 11/15/01 sleep study was performed by Janet Howard-Flanders, MD of Yale University Center for Sleep Medicine. She wrote:    508-510

    "This 61 year old man returns for polysomnigraphy with CPAP titration after previous polysomnigraphy on 10/9/01 was positive for obstructive sleep apnea....During the previous polysomnigraphy, the plaintiff was found to have obstructive sleep apnea with an apnea/hypopnea index of 24/hr associated with significant sleep fragmentation with an arousal index of 37/hr snoring and cyclic oxygen desaturation, particularly in REM sleep....He reports achieving 8 hours of sleep with a bedtime of 9:30p.m. and an arise time at 5:30 on weekdays. On the weekends, the bedtime is 11:00p.m. with an arise time of 8:00a.m. He typically takes a daytime nap lasting 1-2 hours every day.

    "Impression: An improvement in obstructive sleep apnea was noted with the use of nasal CPAP at 11 cm H2O on this study night. The patient did have periodic leg movements in sleep, but these were not associated with sleep fragmentation.

    "Recommendations: Nasal CPAP at 11cm H2O is recommended in this patient, while other correcting factors are being identified and treated. Clinical correlation is recommended to determine any clinical significance to the increased periodic leg movements in sleep.

52. Plaintiff's 10/11/01 sleep study likewise was performed by Dr. Howard-Flanders. She wrote to Dr. Kernan that "The study was positive for obstructive sleep apnea with a hypopnea index of 28/hr with events more marked in REM sleep than non-REM sleep. More marked supine than non-supine."    511

25

| | | |
|---|---|---|
| 53. | Keirnan Shields asked for a medical opinion on the following question: "Do new sleep study reports and new AP letters support these restrictions of only 4-6 hours of work capacity?" | 516 |
| 54. | After reviewing all the information in the administrative record, Dr. Krell answered Shields on 12/20/01 | 527-529 |

Dr. Krell wrote:
"Analysis of information: The claimant has a history of daytime sleepiness with documented sleep apnea and improvement was noted with use of nasal CPAP. Mr. Pasquini's sleepiness score is in the lower range of the "severe" category. Though Dr. Kernan mentioned narcolepsy (8/6/01), characteristic symptoms of narcolepsy have not been noted and a multiple sleep latency test has not been performed.

"The typical change in sleep patterns with aging involves a greater tendency to have interrupted sleep during the night and a corresponding greater tendency to nap during the day. Mr. Pasquini's reported need to nap in the early afternoons is characteristic of this pattern and he does have documented sleep apnea. Though his daytime sleepiness was sufficient enough to cause him to have a medical evaluation, records do not note a history of falling asleep while driving or falling asleep in social situations or other inappropriate circumstances. Additionally, the claimant's habit of taking his sailboat out on Long Island sound, by himself, appears to be inconsistent with the claim of impairing somnolence. Surveillance documented activity that would be consistent with a light level of physical exertion. The claimant was only observed for an extended period (7 hours) on one day from noon to about 7 p.m. on that day he did not take an afternoon nap. On 2 days, surveillance was terminated while the claimant was out on his sailboat; there is no information about how much longer he was active after termination of surveillance on those days.

"It is reported that the claimant's daytime sleepiness dates from the time of his CVA. Fatigue (which is different from sleepiness), and sleepiness are recognized symptoms of stroke and a variety of other significant neurologic dysfunctions. it is not clear that the claimant's sleepiness is caused primarily by the stroke.

"Sleep apnea was documented with the 2 recent sleep studies and amelioration of sleep apnea was documented with the use of CPAP; it would be expected that the use of CPAP would significantly diminish the symptoms.

"Conclusion:
"Claimant has consistently reported daytime sleepiness since his CVA. Fatigue and sleepiness are sometimes recognized after CVAs. Sleep apnea, a more common cause of daytime sleepiness, was documented with improvement noted with the use of CPAPs; the use of this modality is expected to reduce the daytime sleepiness.

"The claimant's self-reported activity and pattern of napping and the observed activity per surveillance are not consistent with an impairing level of daytime sleepiness that would preclude the performance of activities required of a sedentary occupation on a full time basis.

| | | |
|---|---|---|
| 55. | On 12/31/01, Shields wrote to Atty. Civitello to inform her that Unum would not reverse its decision. | 530-531 |

"Mr. Pasquini's file reflects that he went out of work from his regular occupation of product manager as of 5/23/97 due to complaints of daytime somnolence and fatigue. His physician has opined that he is only capable of 4-6 hours of work capacity. Our medical department has again reviewed Mr. Pasquini's entire medical file including the recently provided sleep studies. It was noted that Mr. Pasquini reported that on most days he is awake for approximately 15 hours, interrupted by 1-2 hour nap in the early afternoon. Our physician stated that surveillance had documented activity (e.g., his habit of taking his sailboat out on Long Island Sound by himself, that would be consistent with light level of physical exertion.) It was noted that Mr. Pasquini was only observed for an extended period of 7 hours on one day, from noon until 7 p.m. On that day, it was noted that he did not take a nap. On 2 other days, surveillance was terminated while Mr. Pasquini was out on his sailboat, so there is no information as to how much longer he remained active on those days.

"Our physician noted that daytime sleepiness is reported to date from the time of Mr. Pasquini's CVA. While fatigue and sleepiness are sometimes recognized symptoms after CVAs, our physician stated that it was not clear that his sleepiness is caused primarily by the stroke. Sleep apnea, which is a more common cause of daytime sleepiness was documented with 2 recent sleep studies. However, improvement in the sleep apnea was shown with use of a CPAP. Our physician noted that use of CPAP would be expected to significantly reduce the complaints of daytime sleepiness.

"It was the conclusion of our physician and Mr. Pasquini's self-reported activity and pattern of napping and the observed activity during surveillance are not consistent with an impairing level of

28

daytime sleepiness that would preclude the performance of activities required of a full time sedentary occupation.

"Based on a review of the above information, it is our determination that your client's condition would not preclude him from performing the duties of several appropriate sedentary occupations. He does not meet the policy's definition of "disabled" applicable after 36 months of payment, and therefore, we have no alternative but to uphold the previous denial of additional group long term disability benefits.

56.  The Policy contains the following definition:                          567

"Material and substantial duties mean duties that:
- cannot be reasonably omitted or modified."

57.  The Policy contains the following definition:                          567

"Disability" is defined under the policy as follows:

You are disabled when Unum determines that:
- you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury;
- you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury; and
- during the elimination period, you are unable to perform any of the material and substantial duties of your regular occupation.

"After 36 months of payment, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.

29

58. The Policy contains the following definition: 566

"Gainful occupation" is "an occupation that is or can be expected to provide you with an income at least equal to 60% of your indexed monthly earnings within 12 months of your return to work."

59. The Policy contains the following definition: 567

"Regular occupation" is "the occupation you are routinely performing when your disability begins. Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location.

60. The Policy contains the following language in its "Certificate Section:" 573

"This policy is delivered in and governed by the laws of the governing jurisdiction and to the extent applicable by the Employee Retirement Act of 1974 (ERISA) and any amendments. When making a benefit determination under the policy, Unum has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy.

## Proposed Conclusions of Law

1. This court has jurisdiction over the plaintiff's complaint pursuant to the provisions of the Employee Retirement Income Security Act ("ERISA") 29 U.S.C. §1001 et seq. as the dispute arises under an employee welfare benefit plan, 29 U.S.C. §1002(1).

2. Prior to 5/22/98, plaintiff was employed by DESCO Corporation as a Regional Sales Manager.

30