

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MARIO PASQUINI | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:03 CV 141 (PCD) |
| | : | |
| | : | |
| DESCO CORPORATION; DESCO | : | |
| CORPORATION LONG TERM DISABILITY | : | July 1, 2004 |
| INCOME PLAN; UNUM LIFE INSURANCE | : | |
| COMPANY | : | |
| Defendants. | : | |

## MEMORANDUM IN SUPORT OF
## PLAINTIFF'S MOTION FOR JUDGMENT[1]

I.    INTRODUCTION

Plaintiff Mario Pasquini ("Plaintiff" or "Mr. Pasquini") submits this brief in support

of his Motion for Judgment and his Opposition to Defendant's Motion for Judgment.  The

decision of Unum Life Insurance Company ("Unum") to discontinue Mr. Pasquini's long-

term disability benefits was arbitrary and capricious because Unum changed its mind

regarding Mr. Pasquini's work capacity even though it received no new information, and

based its decision on a medical file review that provides no credible basis for rejecting the

opinions of Mr. Pasquini's treating physicians that he suffered from disabling afternoon

somnolence and fatigue resulting from a stroke, anti-hypertensive medications and sleep

apnea.

---

[1] Plaintiff has adopted this brief as well as its Opposition to Defendant's Motion for Judgment.

## II.    FACTS

### A.    Processing of Claim

Plaintiff was employed as a Product Manager by DESCO Corporation.[2] Administrative Record[3] (hereinafter, "AR") 107.  His duties were essentially that of a sales representative for the northeast United States.  AR 129  Much of his job duties involved driving to customer facilities throughout the Northeast.  AR 112.  He covered a territory from northern Virginia, to Maine to Buffalo, New York, and frequently drove 600 miles a week.  AR 238.  Under the Department of Transportation classification system, Unum classified his position as a Wholesale Marketing Representative, for which driving is a material duty.  AR 130.

In February 1996, Mr. Pasquini was hospitalized with "a left hemispheric lacunar infarction in the setting of severe hypertension."  AR 122, Letter of Walter N. Kernan, M.D. dated July 23, 1998 to Unum.  As a result of the stroke, he suffers from dysarthira, right leg weakness, impaired dexterity n the right hand, and disabling fatigue.  Id. His primary care physician is Dr. Kernan.  He is an Associate Professor of Medicine, Section of General Medicine at Yale University.  As Unum noted, he is "highly credentialed."  AR 14.  Dr. Kernan told Unum that Mr. Pasquini becomes exhausted after an active day, and has fallen asleep while driving several times.  AR 122.  He also stated that Mr. Pasquini suffers from right-sided heaviness and right foot dysfunction after "effortful activity including walking,"

---

[2] Pursuant to a stipulation by the parties that Unum is the proper defendant in this action and is liable for any relief granted by the Court hereunder, plaintiff has withdrawn his claims against his former employer and the disability benefit plan.  The only remaining defendant in the suit, therefore, is Unum.
[3] The entire administrative record was submitted as an exhibit to Defendant's Motion for Judgment, to which exhibit reference in made herein.

which further contributes to his fatigue. AR 123. As Dr. Kernan reported, Mr. Pasquini did attempt to return to full time work, but his fatigue made him unable to keep up with the demands of his job, and it is unsafe for Mr. Pasquini to drive in the late afternoon. Id. Dr. Kernan stated "I believe Mr. Pasquini made a valiant effort to remain at work." Dr. Kernan stated that he believed Mr. Pasquini's impaired endurance and fatigability relate to his stroke, to which his medication may contribute. Id.

On July 9, 1998, Unum approved benefits retroactively to May 30, 1998 through July 31, 1998 and requested additional information. AR 9. Dr. Kernan provided the information referenced in the prior paragraph. AR 122. In is physical capacity evaluation he prepared for Unum, Dr. Kernan reported that Mr. Pasquini did have some physical capacities, in that he could frequently pull and push, and could occasionally stoop, kneel, crouch, crawl and climb, but stated that "travel produces extreme fatigue that impairs function." AR 120, 119. Dr. Kernan submitted a sleep study showing that the Mr. Pasquini's fatigue, at that time, was not the result of a sleep disorder. AR 116.

He was examined by Dr. Stephen Huot, a hypertension specialist, who stated in May 1998 that while his fatigue was clear, it was difficult to determine whether the fatigue was the result of the medication or the stroke. Dr. Huot stated that he had discussed Mr. Pasquini's disability status with him, and that they were in agreement with Dr. Kernan about a plan to address it. AR 37 Mr. Pasquini agreed to a psychiatric evaluation to determine if depression could be causing the fatigue. AR at 37.

Unum knew early on the extent of Mr. Pasquini's physical activity. In an interview in August 1998, Mr. Pasquini informed Unum that he walked 3 to 4 miles a day to improve

3

his stamina. AR 113. He further reported that he could drive for up to an hour, but would then fall asleep. AR 112. He had spoken with his employer about changing his job so driving would not be required, but the employer said he had to make customer visits to keep his job. AR 112, 114, 115.

On July 2, 1998 as Unum requested, Mr. Pasquini has a sleep study. While detecting some sleep apneas, the amount was not sufficient to justify a diagnosis of sleep apnea. AR 117. The physician interpreting the study concluded that "his daytime sleepiness seems most clearly explained by his sensitivity to sedating medications, especially beta blockers." AR 117.

In reviewing the materials Unum received, Unum determined that Mr. Pasquini's restrictions and limitations were reasonable and that they could not expect significant improvement. AR 123. Unum, through Dr. Charles Perakis, found that the restrictions and limitations were reasonable. AR 123. Unum further concluded, based on a review of Mr. Pasquini's occupation by an occupational expert, that driving was a material duty of his position, so the restrictions and limitations did prevent him from performing his profession. AR 130. The necessity of driving his profession was confirmed by his employer, who stated that travel was required 50% of the time. AR 136.

Based on its findings that Mr. Pasquini's restrictions and limitations were reasonable and supported by medical evidence, on August 24,1998, Unum reaffirmed its initial approval of benefits approved benefits. AR 140, 145.

Unum continued to seek information from Mr. Pasquini's doctors. On September 28, 1998, Dr. Kernan responded to further questions from Unum. The questions are at AR

87 and his response is at AR 154. Many of the questions asked about any psychiatric, "psychosocial" or "psychobiological" aspects to Mr. Pasquini's disability. Dr. Kernan emphatically denied that Mr. Pasquini was suffering from any psychological illness. He affirmed that Mr. Pasquini was not a malingerer, and that he wanted to return to work. With regard to his treatment plan for Mr. Pasquini, Dr. Kernan stated that they would continue to work on controlling his blood pressure with less medication. Id.

Dr. Kernan also discussed other medical referrals that he had made to assist in diagnosis and treatment of Mr. Pasquini, as follows:

- He referred Mr. Pasquini to Dr. Alyse B. Sicklick for evaluation of the role of stroke in Mr. Pasquini's condition. She determined that Mr. Pasquini's fatigue was the result of his stroke, lack of aerobic conditioning and the multiple medications he was taking to regulate his blood pressure. She recommended weight loss and exercise to increase his aerobic conditioning. AR 153.

- He discussing working with Dr. Stephen Huot, a hypertension expert, to develop an optimum medication program While the medications might be causing him fatigue, "control of his hypertension is an absolute necessity because of his history of stoke and atrial fibrillation." Dr. Huot found that control of Mr. Pasquini's hypertension was variable, and that he was unable to reduce his medication in attempting to reduce his fatigue. AR 175,

In an October 26, 1998 interview with Unum, Mr. Pasquini again disclosed that he takes a two-mile walk daily, after which he is "pooped" and naps for three hours. He also was enthusiastic about participating in Unum's vocational rehabilitation program. AR 157,

5

156. Again in a January 25, 1999 interview, Mr. Pasquini again told Unum that he tries to walk a couple of miles a day, and tries to do fifteen to twenty minutes on a stationary bike. Mr. Pasquini's physicians repeatedly stated the importance of Mr. Pasquini doing aerobic exercise. AR 153, 181, 182, 177

Mr. Pasquini continued his treatment throughout this period. The medications were variable in controlling Mr. Pasquini's hypertensions, so his physicians did not want to reduce his medication. AR 169, 175, 177.

In February 1999, Unum evaluated the medical evidence, noting that he walked several miles a day, but would nap for two hours afterwards. AR 192. Unum confirmed that Mr. Pasquini's complaints were not subjective, but were objectively supported by his elevated blood pressure, and by the fact that blood pressure medication did contribute to fatigue. AR 196. Mr. Pasquini's blood pressure medication was actually increased in this time period, further increasing his fatigue. AR 198.

Unum's determination that Mr. Pasquini was disabled was confirmed in February 1999, when Mr. Pasquini was awarded social security disability insurance benefits in the amount of $1,446, with a lump sum retroactive to February 2000. AR 337, 365

In June 1999, Dr. Kernan had released Mr. Pasquini for part-time work, so long as his need for an afternoon nap could be accommodated. AR 218, 217. According to Unum, Mr. Pasquini had expressed great interest in working part-time and vocational rehabilitation. AR 156. Unum was unable to find any suitable part-time work, however. AR 598. Vocational rehabilitation found that if Mr. Pasquini has a need for an afternoon nap, he probably had no work capacity. AR 613.

6

Unum continued to gather information about Mr. Pasquini's activities, and Mr. Pasquini again told Unum he had a boat. AR 219. Unum learned that Mr. Pasquini's individual disability insurer had conducted surveillance, which had confirmed Mr. Pasquini's restrictions, and that Mr. Pasquini rarely left the house. He did do occasional yard work but was sluggish and didn't last long. AR 223, 225.

On June 29, 1999, Unum conducted an extensive in-person interview with Mr. Pasquini. Unum learned that he did walk his dog for up to a mile, but then would come home and go to sleep. AR 237. He would do some home projects, but had to plan them carefully so he would be rested and could take a nap afterwards. AR 236. Mr. Pasquini further stated that he had a sailboat and would hang out at the marina or on his boat on weekends. AR 234, 611. He informed Unum that if he does an hour of physical work, he goes to sleep. AR 236. When the Unum representative asked him if he ever went to a department store or mall, he said that he had to consider how much walking would be involved and would try to reduce any other physical activity on that day. AR 235. With regard to work, he stated that he would like to work part-time. He had looked for work that he could do at home so he could accommodate his need to rest, but had been unable to find any. AR 234.

On August 4, 1999, reviewing all the records in the file, including the July 2 interview that disclosed the full extent of Mr. Pasquini's activities, Unum concluded that Mr. Pasquini's medical condition was unlikely to change, and that it was reasonable that he needed an afternoon nap. AR 240. Unum decided that it will pay full benefits for the three-year "own occupation" period. It then concludes, that after the own occupation period, it

will pay "a % of liability until Age 65." Id. Unum has therefore made the decision not to pay

Mr. Pasquini full benefits, even though it has no idea what his condition will be at the end of

the period, and without conducting **any** vocational assessment to determine whether there

are any "other occupations" that he is capable of performing in light of his limitations,

which they had just decided were reasonable and unlikely to improve. Id.

During this period, Mr. Pasquini and his doctors continued to try to adjust his

medication to reduce the side effects, including fatigue, but were unable to do so. AR 289.

Mr. Pasquini's doctors consistently responded to Unum's inquiries that they were unable to

determine when and whether Mr. Pasquini would become acclimated to his medication. AR

323. Unum continued to find that his restrictions were reasonable, and that they were

objectively explained by his stroke and blood pressure medication. AR 328. In June 2000,

Dr. Kernan wrote Unum that Mr. Pasquini's blood pressure was still erratic, and despite the

effect on his fatigue, one of his medications had recently been increased 50%.

Unum continued, as of January 2001, to find that Mr. Pasquini's restrictions were

reasonable and that his stroke and the medications he took provided an objective

justification for the restrictions. AR 377.

In March 2001, Unum ordered surveillance to evaluate Mr. Pasquini's eligibility for

benefits after the own occupation standard period. The private investigators were told to

focus on his need for daytime sleep, and his use of his sailboat. AR 403.

Unum's private investigators did a total of 56 hours and 46 minutes of on-site

surveillance over a five-day period. AR 422. The video of activity disclosed the following:

8

1. On June 23, Mr. Pasquini was observed performing light yard work for thirty-three minutes, after which he was not seen outside again the rest of the day;

2. On June 24, he was observed driving fifteen minutes to a store, where his wife ran an errand, and then driving to a house in Newtown, for a total of 56 minutes of driving. He remained at the house from 12:58 p.m. to 6:24 p.m. The private investigators could see nothing about what Mr. Pasquini was doing at the house for the five and a half hours that he was there. AR 416 – 417.

3. On June 25, Mr. Pasquini's car was observed at a marina for 2:43 to 5:12, when he was observed motoring his boat back into the harbor. AR 414.

4. On June 26, he was observed motoring his sailboat, raising the mail sail and unfurling a roller jib. AR 412. He is observed out on his boat from 2:43 until 3:00. Personal surveillance of Mr. Pasquini was terminated at this point, though the investigators determined that he had not returned to the marina by 4:10 p.m. when surveillance was terminated. AR 411. The investigator had monitored Mr. Pasquini for the whole day, and had determined that Mr. Pasquini remained at home earlier in the day until at last 2:03 p.m. AR 412.

5. On June 27, he was observed driving twenty-eight minutes to park, where he walked his dog for about an hour, after which he returned to his house. He was not seen out of the house for the remainder of the day. AR 410

9

related to his stroke and blood pressure medications.  He made clear that Mr. Pasquini is

occasionally able to forgo a nap, but with any regular physical or mental effort, he becomes

extremely tired, and "is unable to keep his eyes open, unable to drive safely, and unable to

concentrate and compete routine tasks."  AR 463.

Based on its assumption that Mr. Pasquini had an 8-hour a day sedentary work

capacity, Unum commissioned a transferable skills analysis ("TSA") based on these

restrictions.  AR 477.  The purpose of the TSA was to determine whether there was any

"gainful occupation" that Mr. Pasquini was "reasonably fitted by education, training or

experience."  AR 567.  A "gainful occupation" is defined as an occupation that can be

expected to provide an income of at least 60% of the claimant's pre-disability income within

twelve months of the return to work.  AR 566.

Based on the assumption that Mr. Pasquini could work eight hours a day, the TSA

found four jobs that Unum claimed Mr. Pasquini was suited to: Engineering Manager –

Electronics; Industrial Engineer; Consultant; and Specifications Writer.  AR 475.  The TSA

identified no part-time positions that would qualify as a "gainful occupation."  Unum

relayed these conclusions to Mr. Pasquini in a September 7, 2001 letter informing him that

Unum was discontinuing his benefits.  AR 483.  In a subsequent telephone conversation

with Unum, Mr. Pasquini made clear that he was qualified for none of these positions.  He

had not done any engineering work for eleven years, had no expertise as a consultant, and

had only done sales and marketing for eleven years.  AR 485.

On September 7, 2001, Unum issued its denial letter, stating as grounds for the

denial that Mr. Pasquini did not present objective medical evidence of his restrictions and

11

that the video showed that he can perform a sedentary job on a full-time basis. Based on the

finding of full-time work capacity, the letter referred to the results of the TSA that there

were full-time jobs Mr. Pasquini could perform. AR 482.

Mr. Pasquini's then-counsel appealed the decision on September 14, 2001. AR 488.

On December 5, 2001, Mr. Pasquini submitted additional objective medical evidence

to support his daytime sleepiness. Two new sleep studies were performed, in which Mr.

Pasquini was diagnosed with sleep apnea. AR 507, 511, 514, 520. He was prescribed

treatment with a nasal continuous positive airway pressure ("CPAP") at night. Id. While

Mr. Pasquini showed improvement with the CPAP, the sleep medicine specialist stated "the

patient had a very low sleep efficiency on nasal CPAP and only achieved a short period of

sleep a the very end of the study night." The doctor further stated: "He did appear to do

better, but the monitoring period was too short to draw significant conclusions as to the

optimal pressure." AR 521. Mr. Pasquini had a second sleep study performed to evaluate

the effectiveness of the CPAP, that showed that it had increased the quality of his sleep. AR

510

On December 20, 2001, Dr. Krell, as noted earlier, a family physician, reviewed the

file in connection with the appeal. Dr. Krell states that "records do not note a history of

falling asleep while driving," ignoring Dr. Kernan's letter, at AR 122 in the record, that Mr.

Pasquini was unable to continue performing is sales position because he was falling asleep

while driving. AR 528. Dr. Krell states that the surveillance one time observed Mr.

Pasquini active for seven hours one day, and states flatly that Mr. Pasquini did not take his

afternoon nap. Dr. Kernan must be referring to the surveillance on June 24, when Mr.

12

Pasquini was observed driving to a house at 12 noon, and leaving there at about 7:00 p.m.

The surveillance however, did not observe anything he did from 12:58, when he arrived at

the house, and 6:24 when he left the house (AR 416 – 417), so Dr. Krell has no principled

basis for concluding that he was active for seven hours or that he did not take a nap.   Dr.

Krell, again with no expertise in sleep medicine, explains Mr. Pasquini's daytime

somnolence as the normal interrupted sleep and need to nap that develops with aging,

ignoring, without explanation, the finding of the sleep experts, at AR 512 and 510 that Mr.

Pasquini's daytime somnolence was the result of sleep apnea and his other physical

conditions.  Despite statements at AR 122 by Dr. Kernan, a board certified specialists in his

area, that Mr. Pasquini's somnolence was primarily the result of his stoke and his

medications, Dr. Krell concluded, without the benefit of actually examining Mr. Pasquini,

that "it is not clear that the claimant's sleepiness is caused primarily by the stroke." AR 527.

Dr. Krell states no medical basis for his rejection of Dr. Kernan's conclusion.  Dr. Krell

concludes that use of CPAP "would significantly diminish" Mr. Pasquini's symptoms.

While Mr. Pasquini did show improved sleep patterns in using the CPAP in a second sleep

study, (AR 510), Dr. Krell made his evaluation of the effect of the CPAP without

determining whether use of the CPAP would actually decrease his daytime sleepiness.

Further, Dr. Krell did not address the issue that when the first sleep study was performed in

July 1998, it found that Mr. Pasquini was not suffering from sleep apnea at that time, even

though he was experiencing his disabling daytime somnolence. AR 118.  Dr. Krell relayed

these conclusions to Mr. Pasquini's then-attorney.  AR 432.

13

On December 31, 2001, Unum denied the appeal, stating again that the surveillance showed him active in the afternoon, and that the CPAP was likely to improve his sleep apnea. AR 530

Following exhaustion of all administrative procedures (Rule 26 Report, Stipulation of Fact H), Mr. Pasquini filed the instant lawsuit.

III.    ARGUMENT

    A.    <u>Case Should Be Decided As a Bench Trial On the Papers Under Fed. R. Civ.</u>
        <u>Pro. Rule 52(a)</u>

The Court should treat the parties' cross motions for judgment as a bench trial on the papers subject to Fed. R. Civ. Pro. Rule 52(a). Appellate courts, including the Second Circuit, have stated that this is the proper way to handle a benefit denial subject to the arbitrary and capricious review standard, since the case simply involves a review of the record. <u>Muller v. First Unum Life Insurance Company</u>, 341 F.3d 119, 124 (2d Cir. 2003); <u>Hess v. Hartford Life & Accident Ins. Co.</u>, 274 F.3d 456, 461 (7th Cir. 2001). Plaintiff has therefore submitted suggested findings of fact and conclusions of law.

    B.    <u>Standard of Review</u>

The parties agree that the plan at issue in this case contains language that is sufficient to establish an arbitrary and capricious standard of review. Under the arbitrary and capricious standard, a decision must be overturned if it is unsupported by substantial evidence. <u>Pagan v. NYNEX Pension Plan</u>, 52 F.3d 438, 442 (2d Cir. 1995). The administrator must present a reasonable explanation. <u>Id.</u>; <u>Delta Family-Care Disability & Survivorship Plan v. Marshall</u>, 258 F.3d 834, 841 (8th Cir. 2001), cert. denied, 534 U.S.

1162, 152 L. Ed. 2d 117 (2002).   Whether the decision is reasonable is determined by both

the quantity and quality of the supporting evidence. 258 at 842.

The parties do disagree as to what type of arbitrary and capricious review should

apply in this case.   Many circuits have adopted a sliding scale of review, even when

applying the arbitrary and capricious standard, and apply a less deferential standard of

arbitrary and capricious review when the entity reviewing the claim is the same entity that

would pay the claim and so has a financial conflict, or serious procedural irregularities exist

that casts doubt on the reviewing entities good faith.  Woo v. Deluxe Corp. 144 F.3d 1157,

1161 (8th Cir. 1998) (procedural irregularities). The Second Circuit applies a different

analytical framework in addressing issues of conflict of interest.  Instead of a sliding scale of

review, the court applies a two-part test:  first, is the administrator's determination

reasonable; and second, whether the evidence shows that the administrator was influenced

by the conflict.  If the claimant shows such a conflict, the arbitrary and capricious standard

drops away and the court applies a de novo standard of review.  Sullivan v. LTV Aerospace,

82 F.3d 1251, 1255 – 1256 (2nd Cir. 1996).  The claimant has the burden of showing that the

administrator was actually influenced by the conflict.  Whitney v. Empire Blue Cross &

Blue Shield, 106 F.3d 475, 477 (2d Cir. 1997).

No Second Circuit case appears to have decided what evidence demonstrates that an

administrator was influenced by a conflict.  In Dorsey v. Provident Life and Accident

Insurance Company, 167 F. Supp. 2d 846, 854 (E.D. Penn. 2001), the court found that a

less-deferential version of the arbitrary and capricious standard of review should apply when

15

the same physician handled the initial denial and the appellate medical review. Based on this irregularity, combined with the fact that the plan administrator would pay any benefits out of its own pocket, the court "places the arbitrary and capricious standard at the far end of the sliding scale, and accordingly will review [the administrator's] decision with 'a high degree of skepticism," 167 F. Supp. 2d at 854, *citing,* Pinto v. Reliance Standard Life Ins. Co., 214 F. 3d 377, 395 (3rd Cir. 2000).

The same procedural irregularities are present in this case. Dr. Daniel Krell was the only physician involved in the initial denial (AR 444), and was the only physician who reviewed the decision on appeal. AR 528. Further, the parties do not dispute that Unum would pay any benefits out of its own funds. Rule 26(f) Report of Planning Conference dated September 24, 2003 and entered by the Court on October 2, 2003 (hereinafter, "Rule 26 Report"), Stipulation of Fact D. Further irregularities exist that justify applying a less deferential standard. On August 4, 1999, Unum's representatives concluded that Mr. Pasquini's medical condition and restrictions were unlikely to change, that that "a need for afternoon nap is reasonable." AR 240. These same representatives then decide, however, that Unum will discontinue benefits at the end of the "own occupation" period, and pay only a percentage of their liability under age 65. The "own occupation" period would not end until August 2001, which was about two years away at that point. They could have no way of knowing what Mr. Pasquini's physical condition would be in the future, having already stated that it was unlikely to change. They could have no way to determine whether any "gainful occupations" would exist at that time. Yet, they decided to deny benefits no matter what the evidence showed at the time so they could pay only a percentage of the claim,

16

rather than the full amount to which Mr. Pasquini was entitled.  Such demonstrated bad faith

is further evidence that Unum was influenced by the existence of a financial conflict.

Further, the fact that Unum did not even address the fact that the SSA found Mr. Pasquini to

be totally disabled is a further irregularity that would justify application of a less deferential

arbitrary and capricious standard of review. The Court should therefore apply a less-

deferential standard of review.  As is made clear below, however, no matter what standard

of review the court applies, Unum's decision was arbitrary and capricious.

     C.    <u>Plaintiff Has Established Disability</u>

     The standard of disability that applies to this case is an "any occupation standard."

The policy states that after benefits have been paid for thirty-six months, as is true here, a

claimant is disabled when "due to the same sickness or injury, [the claimant is] unable to

pe3rform the duties of any gainful occupation for which [the claimant is] reasonably fitted

by education, training or experience." AR 567.  The policy defines "Gainful Occupation" as

"an occupation that is or can be expected to provide [the claimant] with an income at least

equal to 60% of [the claimant's] indexed monthly earnings within 12 months of [the

claimant's] return to work." AR 566.

     Mr. Pasquini's physicians have established that due to his stroke and

antihypertensive medications, Mr. Pasquini has a part-time work capacity so long as his

need to sleep in the afternoon can be accommodated.  AR 216, 217.  Unum's vocational

experts have opined that the requirement of afternoon sleep means that Mr. Pasquini has no

work capacity.  AR 613.  Unum also agreed that this restriction was reasonable and was

objectively supported by Mr. Pasquini's stroke and side effects of Mr. Pasquini's

17

medication. AR 123, 196, 240, 328, and 377. Unum has identified no part-time positions to which Mr. Pasquini is suited that pay, or can be expected to pay, Mr. Pasquini 60% of his pre-indexed earnings. There is nothing in the record that would dispute the fact that if Mr. Pasquini needs to sleep in the afternoon after working for several hours, no part-time positions exist that satisfy the definition of "gainful occupation." Mr. Pasquini has established that he must sleep in the afternoon after working, and that this restriction is objectively supported by his history of stroke and need to take anithypertensive medication. He is therefore disabled under the Plan and is entitled to receive benefits.

While Unum decided to discontinue benefits at the time the policy switched from an "own occupation" to an "any occupation" standard, the switch is not material to this appeal. Unum has never claimed that Mr. Pasquini could perform a part-time occupation that would qualify as a "gainful occupation" as defined in the Plan. Since Unum never asserted this as a basis for its denial in the administrative process (AR 482, 530), it cannot now argue a new reason for the denial. Vizcaino v. Microsoft Corp., 120 F. 3d 1006, 1016 (9th Cir. 1997). The only issue for this appeal, therefore, is whether Mr. Pasquini's need to sleep in the afternoon after working several hours is a valid. If it is, then under the current record, there is no evidence of any gainful occupation that Mr. Pasquini could perform on a part-time basis that would allow him to sleep after working several hours. Therefore, if the Court finds that Unum arbitrarily and capriciously rejected this limitation, then Mr. Pasquini is entitled to prevail on this appeal.

    D.      <u>Defendant's Denial of Benefits is Arbitrary and Capricious</u>

18