Unum's decision to discontinue Mr. Pasquini's benefits was arbitrary and capricious because there is no reasonable basis for Unum to conclude that Mr. Pasquini's need to sleep in the afternoon after performing several hours of physical or mental work was false. Unum based its decision to deny Mr. Pasquini benefits on a surveillance video and an opinion of an in-house Unum physician that is primarily based on the video.[4] The video is not a reasonable basis for Unum to deny benefits because nothing in the video shows that Mr. Pasquini does not need to sleep in the afternoon after working for several hours. Also, the video only discloses activities that Mr. Pasquini had told Unum about prior to Unum's decision that Mr. Pasquini's restrictions were reasonable and based on objective medical evidence. The video, therefore, provides no basis for Unum to change its mind. With regard to the opinion of Unum's in-house physician, the opinion is not credible. The factual basis of the decision is faulty because it is based on a conclusion that the video shows Mr. Pasquini taking actions inconsistent with his need to sleep in the afternoon after working for several hours. The medical basis of the opinion is faulty as well: the in-house physician is a family practice doctor unqualified to review the opinion of Mr. Pasquini's specialists, and the in-house physician provides no medical basis for rejecting the opinions of Mr. Pasquini's treating physicians.

1. <u>Denying Benefits On the Basis that Plaintiff Did Not Present Objective Medical Evidence is Arbitrary and Capricious</u>

---

[4] Unum also had an in-house representative conducted a transferable skills analysis ("TSA") to identify occupations that Mr. Pasquini could perform that would satisfy the Plan's definition of a "gainful occupation." AR 478. The TSA was performed on the assumption, however, that based on the video, Mr. Pasquini had the capacity to work a full-time sedentary job. As discussed below, the video does not provide a credible basis for this decision. Since the video does not show that Mr. Pasquini had full-time work capacity, the TSA, since it is based on this conclusion, provides no reasonable basis for Unum's decision.

19

The primary basis Defendant relies in its Motion for Judgment to justify the benefit denial is that Mr. Pasquini did not present objective medical evidence in support of his restrictions and limitations. AR 482. This is an arbitrary and capricious basis to make the decision because Mr. Pasquini has presented objective medical evidence to the greatest extent possible considering the medical conditions causing his disability, and requiring objective medical evidence beyond what is logically possible in light of the claimed physical condition is an abuse of discretion.

The Administrative Record discloses ample objective medical evidence that Mr. Pasquini suffered a stroke, has dangerously high blood pressure, and takes high doses of medications a side effect of which is fatigue and somnolence. The record reflects many observations and evidence of Mr. Pasquini's fatigue, such as the fact that he falls asleep while driving (AR 122) and has greatly increased right side impairment after effortful activity. AR 120. Further, he has presented objective medical evidence of the cause of his fatigue. His stroke was documented as a left hemispheric lacunar infarction. AR 122. The stroke caused him dysarthra, right leg weakness, impaired dexterity in the right hand, and right-side heaviness and right foot dysfunction after effortful activities. Id. Dr. Kernan, Dr. Huot and Dr. Sicklick, all specialists in this area of medicine, agreed that his fatigue was well explained by his stroke and the medications he took. AR 122, 117, 153. The record is replete with references to his high blood pressure, and the serious consequences of not controlling it, and that his medications could not be reduced. AR 175.

Unum as well concurred that Mr. Pasquini's restrictions were supported by objective medical evidence. Unum on at least four separate instances stated that Mr. Pasquini's

20

restrictions were reasonably explained by his stroke and antihypertensive medications, as shown on the chart on the next page. It was only when Unum reached the date it had determined two years before (see AR 240) that Unum suddenly decided, on the basis of no new medical evidence, that Mr. Pasquini's restrictions and limitations were no longer supported by objective medical evidence.

    To the extent that Unum requires Mr. Pasquini to present objective medical evidence of his restrictions other than observations that he is fatigued and clear medical causation of the fatigue, imposing the requirement is arbitrary and capricious. A plan cannot require objective medical evidence that logically cannot exist due to the nature of the impairment. Lemaire v. Hartford Life and Accident Insurance Company, 2003 U.S. App. LEXIS 13421, *13 (3rd Cir. June 30, 2003) (illogical and arbitrary and capricious to require objective medical evidence for chronic fatigue syndrome, since one of the diagnostic criteria is the lack of such evidence; allowing such a requirement would impose "an impossible hurdle"); Hawkins v. First Union Corporation Long-Term Disability Plan, 326 F.3d 914, 919 (7th Cir. 2003) (imposing such a requirement for fibromyalgia would mean that no fibromyalgia patient would ever be able to get disability benefits). Imposing an objective medical evidence requirement for conditions that cannot be shown by objective medical evidence is particularly arbitrary and capricious when the plan contains no provision stating that such evidence must exist. In Mitchell v. Eastman Kodak Company, 113 F.3d 433, 443 (1997), the court held that imposing an objective medical evidence requirement for conditions that cannot be shown by objective medical evidence would "defeat the legitimate expectations of participants," since a participant reading the plan would never know that

coverage for conditions that cannot be shown by objective medical evidence are not covered. *Accord.*, Durr v. Metropolitan life Insurance Company, 15 F. Supp. 2d 205, 212 (D. Conn. 1998) (Goettel, J.) (requiring objective medical evidence other than opinion of treating physicians is arbitrary and capricious when plan does not impose such a requirement). If the Plan is not going to cover disabilities that cannot be proved by objective medical evidence, the least the plan can do is disclose that fact in the Plan so a participant could know that such conditions are not covered by the plan.

The cases defendant cites in support of its argument that Unum is allowed to request objective medical evidence no matter what condition the claimant suffers from are all factually distinguishable. In Martin v. Continental Casualty Company, 96 F. Supp. 2d 983 (N.D. Cal. 2000), several of plaintiff's treating physicians explicitly found that the plaintiff had capacity to perform a sedentary job. Id. at 988, 994. Others explicitly found that the plaintiff did not have the condition on which his claim was based. Id. The plaintiff himself admitted that he was "capable of a range of activities encompassing his sedentary job." Id. at 994. Maniatty v. UNUM, 218 F. Supp. 500 (S.D.N.Y. 2002) involved back pain, a condition that logically can be evidence by objective evidence. In Williams v. UNUM Life Insurance Company of America, 250 F. Supp. 2d 641, 646 – 647 (E.D. Vir. 2003), the claimant's treating physicians never stated that he was disabled, and the record disclosed literally hundreds of observed activities by the claimant that directly contradicted his claimed limitations. In Boardman v. The Prudential Insurance Company, 2003 U.S. App. LEXIS 14672 (1st Cir. July 23, 2003), no doctor ever placed any restrictions on her work or considered the requirements of her job, stating simply that she was disabled. In Coffman v.

22

Metropolitan Life Insurance Co., 217 F.Supp.2d 715, 725, 733 (S.D.W.V. 2002), there was video evidence that directly contradicted the claimant's claimed limitations.[5] As discussed by the court in Martin, the question in the end is not whether the evidence is objective or subjective, but rather whether when examined as a whole, the plaintiff has shown that she is disabled. Martin, 96 F. Supp. 2d at 994. In the cases defendant cites, the there was either glaring evidence that the claimant's restrictions were false, and/or directly contradictory medical evidence. Plaintiff is not arguing that a plan can never require objective medical evidence unless the plan explicitly contains such a requirement. Whether the impairment **cannot** be shown by objective medical evidence, courts should not allow Unum to simply waive the talisman of "objective medical evidence" to defeat a benefit claim. Unum must present substantial and credible evidence to justify its decision to reject the opinions of Mr. Pasquini's doctors, which it has failed to do.

### 2. Unum's Reliance on the Activities Shown In the Video Surveillance To Deny Benefits Is Arbitrary and Capricious.

It is important for the Court to note, that prior to Unum conducting the surveillance, Mr. Pasquini had admitted that he did the following activities:

- He tried to take walk for several miles every day (AR 113, AR 157, AR 237);

- He would do occasional yard work, but would have to rest afterwards (AR 236, ), which fact was confirmed by the independent disability insurer's surveillance (AR 223, 225);

---

[5] Defendant on page 17 also cites Werthein v. Hartford Life Insurance Co., 2003 U.S. Dist. LEXIS 10807 (E.D. Vir. 2003). While the issue of requiring objective medical evidence is mentioned in footnote 36, it is discussed in the context of whether the plaintiff has shown the insurer "clearly abuse[d] its discretion" so as to avoid a remand to the plan resulting from a finding that the administrative process was defective. The case has limited applicability to this case.

23

- He went out on his boat (AR 234, 401, 611); and
- He could drive for up to about forty-five minutes to an hour before needing a nap. AR 112, 115 – 110.
- Occasionally, he could skip his nap.

With knowledge of these facts, Unum repeatedly confirmed that these activities were consistent with restrictions, and that the restrictions were supported by objective medical evidence, as shown by the following quotes of Unum personnel contained in the administrative record:

| Date | AR Cite | Comment |
| --- | --- | --- |
| 8/13/1998 | 123 | "We have medical consensus that the insured's stroke and medication side effects are a component of his fatigue. . . . Thus, R&L's are reasonable and we would not expect significant improvement," which opinion was agreed to Dr. Charles Perakis |
| 4/19/1999 | 196 | "BP remains uncontrolled @ this time – this is not a subjective issue. Antihypertensive medication can contribute to fatigue" |
| 8/4/1999 | 240 | "We all agreed that clmt cx will not change and that med states meds he is on would fatigue him and a need for afternoon nap is reasonable." |
| 3/8/2000 | 328 | "Fatigue could be explained by s/p stroke, antihypertensive meds . . . R&L's Reasonable: Yes" |
| 1/3/2001 | 377 | "It appears that AP has given clmt PT sedentary functional capacity – this is reasonable" |

Mr. Pasquini never attempted to hide any of these activities. He consistently told Unum about them, from one of the first interviews (AR 113) up to the conversation just before he learned of the surveillance. AR 433.

The surveillance only revealed activities that Unum knew about when it concluded that his restrictions were reasonable, and that he had no work capacity due to his need for an

afternoon nap. AR 613. This was precisely the same situation in Morgan v. Unum Life Insurance Company, 342 F.3d 1173, 1177 - 1178 (8th Cir. 2003), which was an arbitrary and capricious review case. Unum in that case relied on surveillance of the claimant to deny benefits. Id. at 1176. The court held that the surveillance was not "substantial evidence" supporting the benefit denial, however, because the surveillance revealed nothing that Unum did not already know when it had approved benefits. Id. at 1178. Similarly in this case, Unum already knew that Mr. Pasquini could perform all of the activities revealed in the video surveillance at the time it decided that his restrictions were reasonable and that as a result, he had no work capacity. The video, therefore, is not substantial evidence justifying the benefit denial. The fact that a plan has approved benefits and then cancels them without receiving any new information discontinued benefits is evidence of an arbitrary and capricious denial. McOsker v. Paul Revere Life Insurance Company, 279 F.3d 586, 589 (8th Cir, 2002) ("unless information available to an insurer alters in some significant way, the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue those payments.")

Even if the surveillance has revealed information that Unum didn't know before, none of the observed activities are evidence that Mr. Pasquini had to sleep after performing several hours of work. Activities shown on a surveillance video can only provide substantial evidence to justify a benefit denial if the activities shown are inconsistent with the claimed disabilities. Rasile v. Liberty Life Assur. Co., 2004 U.S. Dist. LEXIS 9940 (S.D.N.Y., 2004) (video showing plaintiff running errands not substantial evidence: "Plaintiff's position is that he is unable to work with 'reasonable continuity,' not that he is bedridden."); Osbun

25

v. Auburn Foundry, Inc., 293 F. Supp. 2d 863, 870 (D. Ind., 2003) ( arbitrary and capricious to rely on video evidence that the claimant could perform light physical tasks for 1.5 hours when administrator "produced no evidence showing how long Osbun can perform such tasks, whether he can perform them on a daily basis, or how much pain he must endure in the process."); Winter v. The Hartford Life and Accident Insurance Company, 2004 U.S. Dist. LEXIS 4550, *15 (March 22, 2004) (twenty minutes of activity over a two day period is not substantial evidence supporting the denial of benefits); Mennenoh v. Unum Life Insurance Company, 302 F. Supp. 2d 982, 989 (2004) (even when surveillance may disclose that the claimant has greater capacity that she reported, if surveillance does not disprove the limitations that keep the claimant from doing her job, relying on the videotape alone is not reasonable: "a conclusion that plaintiff should not spend the whole day on her feet is not inconsistent with evidence that plaintiff was able to stand (while leaning on a bar) for up to one hour."); Clausen v. Standard Ins. Co, 961 F. supp. 1446, 1457 (D. Colo. 1997) ("There is nothing in the record suggesting [the claimant] was capable of such activity on a sustained basis or that the video documented anything other than a good day.")

There was only one instance in which Unum observed Mr. Pasquini taking any action of the course of an entire afternoon. On June 24, the video shows Mr. Pasquini leaving his house at 12:00 noon, droving to another house, at which he arrived at 12:58, and which he left at 6:24. Unum, however, has no idea what he was doing in the house, whether he was sitting in a chair talking, or even whether he took a nap. Even if he didn't take a nap, visiting with friends for several hours is not evidence that he could perform sustained mental work, which Dr. Kernan stated was disabling (AR 218), especially since the video disclosed

26

nothing about what Mr. Pasquini had done earlier in the day. AR 418.[6] Dr. Kernan's opinion was not that Mr. Pasquini invariably had to take a nap everyday; it was instead that after several hours of work, he had to sleep.   It is arbitrary and capricious to find that a claimant can perform a full-time, eight hour a day, five day a week job based on the claimant's ability, on a single day, to at best, sit in a chair and visit with friends.

With regard to the videos showing Mr. Pasquini taking a walk with his dog, Mr. Pasquini was following his doctor's orders in trying to increase his aerobic capacity. AR 152. It is arbitrary and capricious to deny benefits on the basis of a video that shows a claimant doing activities that the treating physician ordered, and that are not factually incompatible with the claimant's restrictions. Mueller v. CNA Group Life Assur. Co., 2004 U.S. Dist. LEXIS 9271, *30 (D. Cal., 2004) (administrator abused its discretion in denying benefits based on a video that showed the claimant performing the exercise ordered by her physician). In any event, Mr. Pasquini remained in his house the remainder of the day, which would certainly have allowed him the opportunity to nap.

The video also showed Mr. Pasquini cutting hedges and trimming bushed for thirty-three minutes, during which he also carried a piece of lattice around his house. AR 419, 418. This is exactly the type of light yard work that Mr. Pasquini has previously disclosed to Unum, (AR 236), which Unum had found to be consistent for his need to sleep in the afternoon after several hours of work. *See, e.g.* AR 240. Unum has no basis to decide that Mr. Pasquini didn't take a nap that day. No activity was observed for either several hours

---

[6] The investigators note that one of the three cars that Mr. Pasquini has at his house was gone for at least 50 minutes in the morning of that day, but they did not see who was driving it. AR 417.

prior to the yard work or for the rest of the day after he finished working in the yard. AR 419, 418.

Unum also relies heavily on the video of Mr. Pasquini out on his sailboat in finding that Mr. Pasquini could work full-time and did not have to sleep after working several hours. It is important for the Court to remember when reviewing the video that, apart from his mental and physical fatigue, Mr. Pasquini has some residual physical capacity. Dr. Kernan certified on the initial Physical Capacities form he submitted, dated September 29, 1998, that Mr. Pasquini could occasionally lift up to 50 lbs, and could frequently bend, stoop, squat, and kneel, and that he had full use of his hands, other than lacking power grip in his right hand. AR 151. All the activities Mr. Pasquini performs on the video when he is sailing are consistent with these limitations. Unum of course knew these facts when it made the initial award of benefits, and repeatedly found that his abilities were consistent with his restrictions, which restrictions meant he had no work capacity. Further, the surveillance on the boat lasted from 2:43 p.m. and 3:00 p.m, or a period of only seventeen minutes. AR 411, 412. Unum therefore has no idea whether what Mr. Pasquini did the remainder of the time he was out, only that he had not returned to the marina by 4:10 p.m. that day. Seventeen minutes of observed activity certainly does not provide "substantial evidence" that Mr. Pasquini had full-time work capacity. Since the surveillance disclosed no activities that were inconsistent with Mr. Pasquini's reported limitations, the video does not provide substantial evidence to support the benefit denial.

The Court must also consider Unum's misrepresentations to Dr. Kernan about what the video showed in determining whether Unum acted arbitrarily and capriciously. Ms.

28

Cole, a Unum representative, wrote to Dr. Kernan on July 26, 2001 that the video disclosed Mr. Pasquini walking his dog for a few hours and then going out and doing errands that same day. AR 432. In fact, the surveillance showed that he walked his dog for one hour and ten minutes, now "a few hours," and that he remained at home for the remainder of the day after the walk. AR 410. Ms. Cole knew that the activity disclosed on the video was not a sufficient basis to deny benefits, and so she grossly exaggerated what the video showed.

### 3. Defendant Has Failed to Establish a Basis for Rejecting Plaintiff's Physician's Findings

The first basis to find that Dr. Krell's opinion is not credible is that the facts do not support the conclusion he draws. The only thing that Dr. Krell points to in the record that is inconsistent with Mr. Pasquini's need for an afternoon nap is the surveillance. See Medical File Review, AR 528. Dr. Krell points to nothing else in the medical records or anything else in the administrative file that indicated that Mr. Pasquini did not suffer from afternoon fatigue and sleepiness. As discussed above, the surveillance does not constitute substantial evidence to support Unum's conclusion that Mr. Pasquini's restrictions are false because Unum knew all these facts at the time it found Mr. Pasquini eligible for benefits and lacking any work capacity, and the surveillance does not factually prove or even indicate that Mr. Pasquini has ever been able to forego his afternoon sleep after working for several hours. Dr. Krell's opinion is therefore not credible because he has based his conclusion on facts that logically do not support his conclusion.

Second, Dr. Krell's opinion is not credible because he lacks the expertise to render an opinion regarding Mr. Pasquini's medical condition, especially based only on a record

29

review, and his opinion lacks any medical basis for rejecting the opinions of Mr. Pasquini's treating physicians.

The Supreme Court in the case of Black & Decker Disability Plan v. Nord, 538 U.S. 822; 123 S. Ct. 1965, 1972; 155 L. Ed. 2d 1034, 1044 (2003) set forth the standard that administrators must follow in reviewing statements by treating physicians. An administrator may not simply ignore a treating physician's opinion. The plan must rebut the treating physician's opinion with credible evidence. Merely saying the treating physician is wrong is not enough. Ladd v. ITT Corp., 148 F.3d 753, 756 (7th Cir., 1998). Review under an arbitrary and capricious standard does not mean that any medical opinion that contradicts the claimant is an adequate basis to deny benefits. The physician conducting the medical review must state a medical basis for his disagreement with the treating physicians, and a plan's reliance on an opinion lacking such reasoning is arbitrary and capricious. Id. In Heffernan v. Unum Life Ins. Co. of Am., 2004 U.S. App. LEXIS 11836, 22-23 (6th Cir., 2004), the court, applying an arbitrary and capricious standard of review, rejected an opinion of Unum's reviewing doctor when he merely criticized the treating physicians' findings of disability without stating any medical basis to reject them. Similarly in this case, Dr. Krell states that the opinions of Dr. Kernan, Dr. Huot, Dr. Janet Hilbert Howard-Flanders (at AR 521) and Mr. Pasquini's other treating physicians that Mr. Pasquini suffers from disabling afternoon somnolence and fatigue caused by his stroke and medications are wrong. Dr. Krell, however, has stated no principled basis for his disagreement with the treating physicians. He relies on only the surveillance, and his observation that the normal aging pattern is to sleep more. AR 528. Dr. Krell's opinion arbitrarily rejects their opinions

without providing any medical justification for why they are wrong. The only possible medical basis stated in the review for Dr. Krell's conclusions is that the last sleep study showed that use of the CPAP increased the quality of Mr. Pasquini's sleep. Further, Dr. Krell never address the issue that when the first sleep study was performed in July 1998, it found that Mr. Pasquini was **not** suffering from sleep apnea at that time (AR 118), yet Unum and his doctors concurred that he was disabled by afternoon somnolence. AR 123, 154. Since Mr. Pasquini was disabled in 1998 even in the absence of sleep apnea, it is not credible to conclude that curing his sleep apnea in 2001 would resolve his daytime somnolence. The fact that Dr. Krell did not even address this logical inconsistency in his opinion demonstrates that he either did not carefully review the record, or was willing to ignore medical evidence that was inconsistent with his desired conclusion that Mr. Pasquini was not disabled. Either way, his opinion is not credible and is not substantial evidence supporting Unum's denial of benefits.

The fact that a plan administrator relies on a medical file review, rather than an independent medical evaluation, to reject the opinion of a treating physician is not in itself grounds for finding that a decision is arbitrary and capricious. The qualifications of the physician performing the review, however, are relevant to determining whether the file review conducted by the administrator's physician is substantial evidence supporting the benefit denial, and whether the basis for the physician's disagreement with the opinions of the treating physicians are credible. In Woo v. Deluxe Corp. 144 F.3d 1157, 1161 (8th Cir. 1998), the insurer had ignored the medical opinion of two specialists in the claimant's scleroderma, and relied instead on an in-house medical review by a non-specialist. The

31

court found that this was such a significant procedural irregularity that it applied a less deferential standard of review. Woo was followed in Sexton v. Deloite & Touche, 2003 U.S. Dist. LEXIS 5158 *19 (March 27, 2003), in which the court found a serious procedural irregularity when the insurer had the file reviewed by a psychologist and a psychiatrist rather than a physician with experience in multiple sclerosis in the face of the claimant's physicians, who were specialists in the disorder: "Woo stands for the proposition that a claimant's file should be reviewed by a practitioner with sufficient training and experience to competently address the claims at issue." Id. at *22. In this case, Unum admitted that Dr. Kernan was "highly credentialed." AR 14. Dr. Stephen Huot is an Assistant Professor of Medicine at Yale University School of Medicine and a hypertension expert, (AR 153) found that it was difficult to sort out the respective roles of the factors that were contributing to his fatigue. AR 37. Dr. Krell, on the other hand, had little difficulty in opining that the fatigue was the result of sleep apnea that would be improved with use of the CPAP and the normal aging process, even though he did not have the benefit of actually examining Mr. Pasquini. Dr. Krell is a family practice doctor, with no special training or evident expertise in diagnosing and treating hypertension or stroke. His only clinical experience was eighteen years at rural clinics and two years in a family medical practice. Unum failed to have any medical review by a physician who was qualified to do so. Dr. Krell's opinion that Mr. Pasquini does not suffer from afternoon somnolence and fatigue is not credible, and is not substantial evidence supporting the benefit denial.

   Third, the Court should give little weight to Dr. Krell's decision on the appeal because he was not independent of the original benefit denial that he was supposed to be

reviewing. ERISA requires that all plans must "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133(2). Dr. Krell played a crucial role in the initial decision to deny benefits to Mr. Pasquini. He was the only physician who approved the initial denial of benefits: on August 9, 2001, Dr. Krell countersigned a document approving the original denial of benefits. AR 444. Not only was he the only doctor who approved the initial decision; he was the only physician who reviewed the file on appeal. AR 528. Dr. Krell therefore reviewed his own decision, and not surprisingly, he agreed with himself. While review by the same personnel who made the original decision is not in itself a basis for finding that a denial was arbitrary and capricious, it cast additional doubt on the fairness of the process, when considered with the other factors indicated Unum's arbitrary denial of Mr. Pasquini's benefit claim.

For the many reasons set forth above, Dr. Krell's medical opinion is not credible and provides not substantial evidence to justify Unum's benefit denial.

    4. <u>Unum Did Not Address Social Security's Finding of Disability</u>

While a decision by the Social Security Administration ("SSA") is not necessary binding on a plan, a plan cannot simply ignore the decision. Ladd, 148 F.3d at 756, (in a long-term disability case, the fact that the SSA found the claimant disabled "brings the case within the penumbra of the doctrine of judicial estoppel"). It has an obligation to articulate the specific grounds on which it distinguishes its own decision from the decision of the SSA. Calvert v. Firstar Fin., Inc., 266 F. Supp. 2d 578, 585 (D. Ky., 2003) ("the Social Security Administration's decision should be considered as a factor in determining whether a plan

33

administrator's decision denying disability benefits was arbitrary and capricious"); Rendulic v. Kaiser Aluminum & Chem. Corp., 166 F. Supp. 2d 326, 338 (D. Pa., 2001) ("the Committee examined and discussed the Plaintiff's favorable Social Security determination, but thoroughly explained its reasons for not finding it persuasive as to whether the Plaintiff was totally disabled under the Plan's definition."); Reipsa v. Metropolitan Life Insurance Company, 2002 U.S. Dist. LEXIS 13188, *17 (June 11, 2002) (failure to review SSA finding of disability demonstrates that the administrator did not act in good faith). In this case, the SSA granted Mr. Pasquini benefits in a decision of February 1999, find that that Mr. Pasquini had no residual work capacity. Unum denied benefits eighteen months later, but nowhere even mentions the social security decision, much less take any action to distinguish the SSA's decision. Unum's failure to even mention the decision further demonstrates that Unum's benefit denial in this case was arbitrary and capricious. As Unum made clear in its "Roundtable Discussion" on August 4, 1999, no matter what Mr. Pasquini's physical condition or vocational ability was at the end of the "own-occupation" period in 2001, it was going to deny benefits and then attempt to pay a fraction of the value of the claim. AR 240. Unum was not going to let the SSA decision stand in the way of its pre-determined decision to deny benefits.

    E.    Relief the Court Should Order

        1.    The Court Should Order Payment of Benefits

In a case in which a plan reverses an earlier decision to pay benefits, the proper relief on finding that the benefit denial was wrong is an order to continue paying benefits, rather than remand further administrative proceedings. Unlike an initial denial of benefits,

34

restoration of the status quo in a discontinuation of benefits case is an order to pay benefits rather than a remand for further proceedings. Hackett v. Xerox Corp., 315 F.3d 771, 776 (7th Cir., 2003) ("the status quo prior to the defective procedure was the continuation of benefits. Remedying the defective procedures requires a reinstatement of benefits."). As the Second Circuit has stated, ordering an award of benefit is appropriate "where the difficulty is not that the administrative record was incomplete, but that a denial of benefits based on the record was unreasonable." Zuckerbrod v. Phoenix Mut. Life Ins. Co., 78 F.3d 46, 51 n4 (2d. Cir. 1996). When the administrative record does not support the denial of benefits, and properly interpreted, can only support an award of benefits, the court should simply order the benefits to be paid. Zervos v. Verizon N.Y., Inc., 277 F.3d 635, 647 (2d Cir. 2002).

Here, the administrative record contains no evidence that provides a credible basis for denying benefits, and the decision appealed from is from a discontinuation of benefits. The proper relief therefore, is an order that payment of benefits should be renewed.

### 2. Plaintiff Is Entitled to Attorneys' Fees

ERISA provides that in an action brought under the statute by a plan participant or beneficiary, the "court in its discretion may allow a reasonable attorney's fee . . . to either party." 29 U.S.C. § 1132(g)(1). The Court should award plaintiff attorneys' fees and costs in this action. All of the factors set forth by the Second Circuit in the case of Chambless v. Masters, Mates & Pilots Pension Plan, 815 F.2d 869, 871 (2d Cir. 1987) to decide this question support an award of fees and costs in this case. Chambless sets for the following five factors:

> (1) the degree of the offending party's culpability or bad faith, (2) the ability of the offending party to satisfy an award of attorney's fees, (3) whether an award of fees

35

would deter other persons from acting similarly under like circumstances, (4) the relative merits of the parties' positions, and (5) whether the action conferred a common benefit on a group of pension plan participants.

Id, 815 F.2d at 871.

Plaintiff is entitled to an award of fees and costs under this standard:

- Unum is highly culpable in this case, for the reasons stated above. It relied on surveillance that did not provide any reasoned basis for rejecting Mr. Pasquini's restrictions, and on a medical opinion that is not credible on any basis.

- Unum, as the largest disability insurer in the country, clearly can satisfy the fee award;

- An award of fees in this case will deter Unum from denying future claims without any medical support. Unless the Court awards attorneys' fees, Unum will suffer no harm from its denial of the claim, since all it will have to pay is the benefits it should have paid anyway.

- The relative merits of the parties' positions indicate that the Court should award fees in this case. Plaintiff has clearly shown that he is disabled, and Unum denied his claim without any legitimate medical justification.

This is not a pension case, so the fifth factor is not directly relevant. Other participants in the plan will be benefited, however, to the extent that Unum is deterred in the future from denying claims without any legitimate medical justification. Further, courts have regularly awarded attorneys' fees to individual claimants for disability benefits. Lain, 279 F.3d at 348; Cook, 320 F.3d at 25; Gunderson, 874 F.3d at 500; Stvartak v. Eastman Kodak Co., 945 F. Supp. 1532, 1547 (M.D. Fla. 1996); Wilkes, 2002 U.S. Dist. LEXIS 8763, *31.

36

### 3. The Court Should Award Prejudgment Interest

The Second Circuit has held that prejudgment interest on wrongfully denied disability benefits is appropriate equitable relief under ERISA §502(a)(3). Dunnigan v. Metro. Life Ins. Co., 277 F.3d 223, 229 (2d Cir., 2002) ("An award of interest in such circumstances serves as an equitable make-whole remedy"). The court held that mere delay in payment was a sufficient basis to award prejudgment interest, and that the claimant did not have to show bad faith. Id. at 230. While this decision did not address the Supreme Court's decision in Great-West Life & Annuity Insurance Co. v. Knudson, 534 U.S. 204, 122 S. Ct. 708, 151 L. Ed. 2d 635 (2002) regarding the appropriate scope of equitable relief under ERISA 502(a)(3), cases since Knudson have continued to find that prejudgment interest is an appropriate remedy for failure to pay benefits. Babcock v. Computer Assocs. Int'l, 186 F. Supp. 2d 253, 260 (E.D.N.Y., 2002) ("Viewing the facts in the light most favorable to the plaintiff, the Court concludes that the interest after a reasonable period of delay can be an implicit benefit under the Plan."); Parke v. First Reliance Std. Life Ins. Co., 368 F.3d 999 (8th Cir., 2004) ("courts may award prejudgment interest as 'other appropriate equitable relief' under § 1132(a)(3)(B) when benefits are wrongfully delayed"); Fotta v. Trustees of the UMW Health & Ret. Fund of 1974, 165 F.3d 209, 212 (3d Cir., 1998). Judge Arterton held in the decision of Dobson v. Hartford Financial Servs., 196 F. Supp. 2d 152, 172 (D. Conn. 2002) that prejudgment interest was appropriate relief under ERISA § 502(a)(3), but did not address the issue in a ERISA §502(a)(1(B) case such as this.

Prejudgment interest should be awarded in this case. Plaintiff has been deprived of, and Unum has had the benefit of, the benefits that should have been paid since benefits were

denied on September 7, 2001. Plaintiff will be deprived of the make-whole remedy he is entitled to unless the court orders an award of prejudgment interest.

IV. CONCLUSION

For the reasons stated above, defendant's Motion for Judgment on the Pleadings should be denied, and judgment should be entered in favor of plaintiff. No basis exists in the administrative record to support Unum's decision to discontinue Mr. Pasquini's benefits. The Court should therefore order Unum to pay all benefits due, along with prejudgment interest and attorneys fees, and should order further proceedings to determine these amounts.

PLAINTIFF

By: _____
David S. Rintoul (ct# 08456)
BROWN, PAINDIRIS & SCOTT LLP
2252 Main Street
Glastonbury, CT 06033
(860) 659-0700

**CERTIFICATION**

The undersigned hereby certifies that the above motion was served by first class mail, postage pre-paid on July 1, 2004 to:

Alexander Schwartz
3695 Post Road
P.O. Box 701
Southport CT 06890

_____
David S. Rintoul

38